**1ST STEPS INTERNATIONAL ADOPTIONS, INC.,**
Petitioner

v.

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 5, 2005.

Decided June 7, 2005.

Publication Ordered Aug. 1, 2005.

Andrew W. Barbin, Mechanicsburg, for petitioner.

Myra Werrin Sacks, Asst. General Counsel, for respondent.

BEFORE: SIMPSON, Judge, LEAVITT, Judge, and JIULIANTE, Senior Judge.

OPINION BY Senior Judge JIULIANTE.

1st Steps International Adoption, Inc. (Petitioner) petitions for review of a May 27, 2004 order of the Pennsylvania Department of Public Welfare (DPW), Bureau of Hearings and Appeals (BHA), that adopted the recommendation of the Administrative Law Judge (ALJ) to deny Petitioner's appeal from DPW's decision not to renew its third provisional certificate of compliance to operate as a private children and youth social services agency providing adoption. We affirm.

Petitioner was organized in 2001 by Lin Strasser; the focus of Petitioner's services was on international adoptions. Petitioner also engaged in "disruption" adoptions, which result from situations where adoptions are completed but not successful and the child is placed into another adoptive family. As required, Petitioner applied for and received provisional licenses from DPW to operate as a private children and youth social services agency providing adoption. It was not licensed as a foster care agency. The business was located in Strasser's home.

Pursuant to Section 1008 of the Public Welfare Code (Code),[1] DPW is empowered to grant an applicant a provisional license for a specific period of time not to exceed six months and may renew the license three times. In September 2002, DPW representatives inspected Petitioner's facility in order to approve a third provisional license. After inspection, but before the third provisional license was issued, DPW received complaints about Petitioner. An investigation ensued.

Based upon its inspection, DPW issued a license inspection summary which contained a list of 19 licensing violations. The violations primarily pertained to Petition-er's personnel records, the manner in which four children were dealt with or affected by Petitioner, the manner in which files pertaining to adoptions were prepared and/or maintained, and compliance with DPW regulations.[2] DPW eventually withdrew its allegations with regard to one employee and one child, leaving a total of 18 violations against Petitioner. Based upon the remaining violations, DPW notified Petitioner of its determination not to renew its third provisional certificate of compliance.

 Petitioner timely appealed. The ALJ held hearings on July 30, August 20, August 28, September 30, October 23 and December 8, 2003. On May 26, 2004, the ALJ issued a recommendation that the appeal be denied and, by order dated May 27, 2004, the BHA adopted the ALJ's recommendation. Petitioner's petition for review to this Court followed.[3]

### Summary of Testimony

With regard to allegations that Petitioner failed to comply with DPW regulations pertaining to adoptions, the vast majority of the testimony was in reference to E.K.,

---

**1.** Act of June 13, 1967, P.L. 31, *as amended,* 62 P.S. § 1008.

**2.** Briefly stated, the violations are as follows: denial of access to records; providing unauthorized foster care; failing to comply with Sections 761–765 of the Code, containing the Interstate Compact on the Placement of Children (ICPC), added by the Act of July 25, 1973, P.L. 205, 62 P.S. §§ 761–765; failing to properly maintain agency personnel records; failing to provide an annual audit; failing to provide written contracts with service providers; failing to notify adoptive families of the availability of counseling; failing to obtain home studies before placement of children in prospective adoptive homes; failing to provide written explanation of reasons for placement; failing to provide child statements in disruptive adoption files; placing a child in

two prospective adoptive homes without proper documentation prior to her return to her adoptive parents; failing to supervise visits prior to issuance of final adoption decree; failing to obtain criminal history checks and child abuse clearances; and failing to obtain FBI clearances where applicable.

**3.** Our review of a final order of DPW is limited to determining whether an error of law was committed, whether constitutional rights were violated or whether necessary findings of fact are supported by substantial evidence. *Woods Servs. v. Dep't of Pub. Welfare,* 803 A.2d 260 (Pa.Cmwlth.2002), *aff'd,* 576 Pa. 228, 839 A.2d 184 (2003). If the Secretary does not reverse any facts found by the hearing officer, these findings, if supported by substantial evidence, are binding on this Court. *Id.*

a young girl whose adoptive family resided in West Virginia. Other testimony related to two other children, Drew and H., and to employee personnel files.

DPW witness Larry Yarberough testified that he is employed by DPW as its ICPC Director. The ICPC requires that placement of children between states be processed in the same manner.[4] According to Yarberough, all interstate placements or adoptions must comply with the ICPC unless specifically excluded. Yarberough stated that Petitioner's file on E.K. failed to contain (1) narratives of her family and the Daniels family, (2) a home study of the K. family and (3) a social history of E.K. Yarberough also viewed a videotape of E.K. The videotape showed the K. family, including E.K., being interviewed at the Strasser home. In Yarberough's opinion, a violation of the ICPC would have occurred because E.K.'s file did not contain the appropriate documentation in the event E.K. was to be placed in Pennsylvania. Yarebourgh's testimony was found to be credible.

DPW witness Kathleen Smith testified that she and her husband Elliot contacted Petitioner when they became interested in adopting a special needs child. At that time, the Smiths did not provide Petitioner with a home study, criminal history checks or child abuse clearances as required by the Child Protective Services Law.[5] In December of 2002, the Smiths learned of E.K. During their visit to Strasser's home, the Smiths visited with E.K. and then took her out to lunch and shopping. Mrs. Smith testified that Strasser informed her that E.K. was subject to a disruption adoption from West Virginia and that E.K.'s parents were looking to place E.K. elsewhere.

After returning to Strasser's home, Strasser told E.K. that she would accompany the Smiths home that day; however, the Smiths were unprepared to take E.K. They decided to pick up E.K. the next day. When they picked up E.K. on December 15, 2002, the Smiths were not given any documentation indicating that they had legal custody of E.K. Mrs. Smith described E.K.'s sleeping quarters as a makeshift bed separated from the rest of the room by a curtain.

Mrs. Smith then testified that at some point during the holiday season, her husband received a call from Strasser who indicated to the Smiths that if anyone should ask about E.K., the Smiths should say that they were friends of the K. family and that they were babysitting. The Smiths returned E.K. to Strasser's home the following day. Mrs. Smith then called the Office of Children and Youth Services (generally OCY) and spoke to Emily Davis Palermo, who asked her to provide a written account of her experience.

On cross-examination, Mrs. Smith stated that she had not spoken to Kerry Palakanis, Petitioner's former employee, until after she had written her letter to Palermo. She also acknowledged that she spoke to Corrina Kline, who is her friend and a former employee of Petitioner. Mrs. Smith also indicated that she and her husband did have a domestic home study done, but not an international one. Additionally, she stated that she and her husband were certified foster care providers. The ALJ found Mrs. Smith's testimony to be credible.

DPW witness Doreen Daniels testified that she contacted Petitioner on December

---

**4.** The ICPC is an agreement among the states, the District of Columbia and the Virgin Islands to cooperate with each other in the interstate placement of children.

**5.** 23 Pa.C.S. §§ 6301–6385.

20, 2002 because she and her husband wanted to adopt a child from Guatemala. When she met with Strasser, E.K. was at Strasser's home and Strasser informed Daniels that E.K.'s parents were considering a disruption adoption and that Strasser was providing a respite for E.K.'s parents. Thereafter, Daniels spoke with E.K. and reviewed the videotape of her. Daniels paid $4,000 to Petitioner for what Daniels considered to be a filing fee.[6] Daniels executed a delegation of parental authority with regard to E.K. Daniels provided Petitioner with a home study on December 20, 2002 and, on her third visit, Daniels took custody of E.K. with the eventual hope of adopting her. Daniels, however, returned E.K. to Strasser on January 6, 2003. Daniels denied speaking to either Palakanis or Kline.

Later during the ALJ proceedings, Daniels was recalled to testify after contacting Petitioner's counsel because she believed that DPW's counsel misrepresented her testimony. When questioned, however, Daniels admitted that no part of her prior testimony was false or inaccurate. Rather, her concerns centered on questions not asked by DPW's counsel. Daniels further indicated that during phone conversations with DPW's counsel, counsel indicated that if she was not pleased with the answers Daniels was prepared to give, counsel would avoid certain questions. The ALJ found Daniels' testimony regarding the circumstances surrounding E.K.'s placement with her to be credible.

DPW witness Elliot Smith testified and confirmed his wife's testimony that he transported E.K. back to the Strasser home after receiving the phone call from Strasser regarding the circumstances under which E.K. was in the Smith home.

Mr. Smith testified that they were interested in adopting E.K.; however, they were not comfortable without having documentation. The ALJ found Mr. Smith's testimony to be credible.

DPW witness Corrina Kline testified that she met Strasser on January 26, 2002 and began discussing the opportunity to work with her and establish an adoption program for children in Bulgaria. After completing an application, Kline began working for Petitioner in August 2002 despite the fact that her child abuse clearance was a year out of date. Palakanis was working for Petitioner at the time that Kline started her employment; however, Kline learned shortly thereafter that Palakanis had started a competing business in Maryland.

During the fall season, Kline learned of the ICPC and became concerned that Petitioner was not in compliance with it. Kline knew that E.K. and another child, D., were in the Strasser home. Kline stated that when she asked Strasser about the ICPC, Strasser told Kline that she did not understand the law.

Additionally, Kline stated that she was friends with the Dalrymple family. The Dalrymple family had used Petitioner's services and was in contact with Kline because the family had received e-mails from Russia indicating that post-placement reports had not been submitted concerning their adoption of two children from Russia. When Kline asked Strasser about the reports, she indicated that the reports had been sent even though the Dalrymples continued to receive e-mails. At the request of Dalrymple, Kline forwarded the Dalrymple post-placement report to Palakanis. Kline stated that upon learning

6. During her subsequent testimony, Daniels stated that she was no longer sure of what the

$4000 payment to Petitioner represented.

this, Strasser threatened her with prosecution for theft.

On cross-examination, Kline stated that personnel manuals were not provided to her and that she never received a job description. Kline testified that she contacted Palermo because of concerns regarding the ICPC and because she believed that Strasser was acting as a foster care agency even though she was not certified to do so. The ALJ found Kline's testimony to be credible.

DPW witness Angela Dalyrmple stated that when she contacted Strasser about the post-placement report, Kline was sent to the Dalyrmple home to meet with the family. After Kline's visit, Dalyrmple expected to get a copy of the report but did not receive one. In September of 2002, she received e-mails from Russia inquiring about the post-placement reports. Dalyrmple spoke to Strasser about the reports and was told that there was a delay. Dalyrmple continued to receive the e-mails from Russia.

Consequently, Dalyrmple, Kline and Strasser engaged in a three-way phone conversation, where Strasser told Dalyrmple that if she wanted a copy of the report, she would have to visit Petitioner's office, pay for it to be translated, and then send it to wherever Dalyrmple thought it should go. Dalyrmple eventually received the post-placement report from Kline.

With regard to E.K., Dalyrmple stated that she visited Petitioner's facility in January 2003 and E.K. was mentioned during the conversation. Since Dalyrmple knew that the Smiths were looking to adopt, she told the Smiths about E.K. The ALJ found Dalyrmple's testimony to be credible.

DPW witness Edward Coleman is employed by OCY in Philadelphia. He stated that on January 6, 2003, Palermo asked him to accompany her to Petitioner's place of business. Strasser was not home at that time, and he and Palermo were denied access to the business. Coleman and Palermo returned later that day after Palermo had received messages from Strasser at the office, whereupon a man approached them. Either Palermo or Coleman explained the purpose of their visit to the unidentified man, who Coleman believed to be either Strasser's husband or her father-in-law. Access to the business was again denied.

Coleman and Palermo returned to Petitioner's office on January 9, 2003 for an announced visit. At that time, Strasser was asked to provide personnel policy manuals and a random selection of adoption files. Coleman noted that Kline's personnel file contained a verified job application, an out-of-date child abuse clearance, an acknowledgment of the Child Protection Services Law, and Kline's resignation. Palakanis' personnel file did not contain any child abuse or state police clearances, despite prior notations that the personnel file did contain said documents. There was no FBI check, which is required for employees who do not live in Pennsylvania. Coleman stated that the personnel files did not contain letters of appointment, job classifications, medical information, performance evaluations, up-to-date child abuse clearances and state police background checks. Coleman further stated that DPW's request to remove files from Petitioner's office in order to be copied at the Wayne County OCY was denied. The ALJ found Coleman's testimony to be credible.

DPW witness Emily Davis Palermo testified that she began receiving complaints about Petitioner in December 2002. The general complaints were that paperwork was not being completed, home studies were not being done, child abuse clearances were not being completed or were

not up-to-date, children were being brought across state lines without regard to the ICPC, and children were residing with Strasser although she was not licensed to provide foster care.

Palermo confirmed Coleman's testimony regarding the January 6, 2003 visit to Strasser's home. She returned on January 7, 2003 with Thomas Knappenburger and asked for a current list of clients and for disruption adoption files, seven files in all. After reviewing the files, Palermo became aware that the files were lacking essential documentation. Strasser provided a copy of the adoption file for another child, N.T.G.; however, copying took a long time because the copying was done through a fax machine. Palermo likewise confirmed Coleman's testimony regarding the January 9th visit and Strasser's refusal to allow them to remove files to be copied at the Wayne County OCY.

On January 16, 2003, Palermo obtained an administrative agency search warrant and returned to Petitioner's business. She selected ten files at random, upon which the violations were partly based. The ALJ found Palermo's testimony to be credible.

DPW witness Leonard Pocius, director of the northeast region of OCY, testified that DPW's regulations require that complete access to an agency's records be given. He was aware of the January 2003 visits, and was concerned over the lack of home studies, child abuse clearances and criminal background checks. The ALJ found Pocius' testimony to be credible.

Petitioner presented the testimony of D.K, E.K.'s adoptive father. D.K. testified that he was a personal friend of Strasser, and his family's decision to leave E.K. with Strasser had nothing to do with Petitioner's business. Rather, Strasser, as a friend, was providing a "respite" for the K. family because they were unsure whether

they wanted to proceed with a disruption adoption. D.K. stated that there was never a contract with Petitioner. Nevertheless, D.K. executed a delegation of parental authority, which he described as a medical power of attorney.

D.K. testified that he was aware that the Smiths were interested in E.K., but that he also understood that the disruption adoption process would take time. He told Strasser that the Smiths could take E.K. home for no more than five days. D.K. then learned that the Smiths had summarily returned E.K. to Strasser. E.K. eventually returned home to the K. family, although at the time of D.K.'s deposition, E.K. was residing with her legal guardian, Strasser. When asked on cross-examination, D.K. stated that he had no concerns regarding Strasser's placement of E.K. with the Daniels family without his knowledge and the required background clearances because he trusted Strasser. The ALJ found that D.K. testified with limited credibility regarding the placement of E.K.

Petitioner also called DPW employee Joseph Clapps, who performed some of the provisional licensing inspections. Although he noted a few violations, Petitioner offered a corrective plan. Clapps acknowledged that Petitioner failed to provide an audit as required by DPW's regulations. He did not have any reason to suspect that Strasser was providing foster care services at the time of his inspections. Clapps had only reviewed one file and was unaware that Petitioner was conducting disruption adoptions and that Kline was an employee. The ALJ found Clapps' testimony to be credible.

Finally, Strasser testified that she incorporated the business in 2001 and that her first employee was Palakanis, who resigned in August of 2002 after the parties had executed a separation agreement.

Strasser then hired Kline in August or September 2002 as administrative support. Kline's responsibility was to respond to e-mails generated from Petitioner's website.

After Kline resigned on December 17, 2002, Strasser learned that Kline was working for Palakanis. Strasser reported to the police Kline's action of forwarding the Dalyrmple post-placement report to Palakanis.

Regarding the complaints, Strasser stated that she was unaware of them until January 2003. On January 6, 2003, Strasser was not home when Palermo and Coleman visited her office. Strasser testified that she did not deny access to Petitioner's files on either January 7 or 9, 2003 to Palermo and Coleman; however, she did acknowledge that based on the advise of counsel, she refused to allow them to remove files from the premises. Strasser offered that she has a high-speed copier and, thus, there was no reason for DPW to remove the files.

Strasser further offered that Kline had stolen the Dalyrmple post-placement report and that Kline had no direct knowledge of the situation with E.K. She denied providing foster care services to E.K. or any other children. She stated that Child Protective Service acknowledgments were executed by both Palakanis and Kline and that they were turned over to DPW during discovery.

With regard to the ICPC, Strasser testified that it was not implicated by her actions because E.K. was never placed for adoption or in foster care. Strasser stated that the K. family was not a client of the adoption agency. She claimed that the Dalyrmples never had custody of E.K. and further denied that she ever executed any documentation in her official capacity with respect to E.K.

With regard to H., Strasser stated that the adoption was done privately and the only contact she had with the parties was to provide training. Hence, there was no need for the files to contain home studies and clearances. Because of H.'s tender age, there could not possibly be a summary of the child's wishes in the file. She also stated that because the adoptions were international, there would be no home studies for the biological parents/families.

Strasser admitted that she did not have a written policy regarding counseling services available to adoptive families but offered that she verbally informed the families of the availability of counseling. Additionally, Strasser stated that because she is licensed under only certain sections of DPW's regulations, she is not required to have background checks and child abuse clearances; however, her files did contain that documentation.

I.

In its first argument, Petitioner alleges that the ALJ abused his discretion by limiting discovery requests related to the impeachment of witnesses. In particular, Petitioner avers that the ALJ improperly refused to issue a subpoena for Palakanis and improperly limited cross-examination of key DPW witnesses as to bias.

Strasser testified that Palakanis, who lives in Maryland, began working for Petitioner shortly after its inception and acted as its director. Palakanis terminated her employment with Petitioner in August 2002. As the ALJ noted:

> [Petitioner] sought to frame the case as a conspiracy between [Palakanis], [Kline], the Smiths, [Palermo], and [DPW] to put her out of business. Whatever the contact between [DPW] and [Palakanis,] nothing exists in the

record to take away from the substantial regulatory violations, which we have examined in this adjudication, and which can solely be attributed to the acts of [Strasser], and other persons acting on her behest.

ALJ determination, p. 34. We have reviewed the entire record in this matter, and agree with the ALJ's assessment of Petitioner's position.

■ Section 35.142(a) of the General Rules of Administrative Practice and Procedure, 1 Pa.Code § 35.142(a), provides generally that an ALJ may issue subpoenas upon application for evidence that is relevant and material to the proceedings. The application must specify the relevancy, materiality, and scope of the testimony sought. *Id.* This Court will not reverse an ALJ's decision to limit witness production except for an abuse of discretion. *Subaru of Am., Inc. v. State Bd. of Vehicle Mfrs., Dealers and Salespersons,* 842 A.2d 1003 (Pa.Cmwlth.2004).

Palakanis' alleged motives in discussing Petitioner's violations with DPW and others are irrelevant to the issue of whether Petitioner was in fact in violation of DPW's regulations. Although Palakanis' discussions with the complainants may have ultimately led to DPW's investigation, the results of the investigation formed the basis for the regulatory violations and DPW's decision to deny Petitioner a third provisional license. Petitioner's files and records were either in compliance with DPW's regulations or they were not; evidence of motives of the complainants is simply not relevant to that issue.

■ Moreover, Petitioner failed to offer any indication that Palakanis' testimony would be anything other than cumulative to the testimony otherwise provided. The trial court may exclude evidence that is irrelevant, confusing, misleading, cumulative or prejudicial. *Lehigh–Northampton Airport Auth. v. Fuller,* 862 A.2d 159 (Pa. Cmwlth.2004).

■ Petitioner similarly complains that the ALJ improperly limited impeachment testimony, especially in light of the testimony of Daniels. As previously noted, Daniels contacted Petitioner's counsel and indicated that she believed that DPW's counsel intentionally examined her in such a way as to skew her testimony.

It is upon this basis that Petitioner asserts that the ALJ improperly limited its cross-examination of DPW's witnesses. We disagree. Petitioner was represented by counsel throughout the proceedings and was provided ample opportunity to address DPW's evidence over the course of the six days of hearings. Because Petitioner's counsel had sufficient opportunity to cross-examine DPW's witness regarding an alleged conspiracy, we cannot conclude that the ALJ abused his discretion.[7]

---

**7.** Petitioner also alleges that the ALJ erred by issuing a blanket statement that certain discovery materials were not relevant. Petitioner had requested the trial preparation materials of DPW counsel, the Smiths, Kline, the Dalyrmples, and any other joint trial preparations of DPW witnesses. After an *in camera* review, the ALJ determined that the requested documents were not relevant. Petitioner asserts that the ALJ should have specifically identified each requested document and provided the reason it was found to be not relevant.

The ALJ had, however, previously determined that evidence of an alleged conspiracy or bias between the complainants prior to DPW's investigation was not relevant. It was the result of DPW's investigation that led to the denial of Petitioner's third provisional license. As such, any evidence of complicity between Petitioner's ex-employees prior to the investigation is not germane. Thus, we conclude that the ALJ's decision not to specifically identify each discovery request falls short of an abuse of discretion.

## II.

■ Petitioner next argues that the ALJ erred in determining that it denied DPW access to records on January 6 and 9, 2003. Sections 20.33 and 20.34 of DPW's regulations provide that an agency is subject to both announced and unannounced visits, and that the agency shall provide authorized agents full access to the facility and its records during said visits. 55 Pa.Code § 20.33 and 20.34, respectively.

With regard to the January 6, 2003 visit, the ALJ noted that Strasser's husband, Joe, refused Palermo and Coleman access to the premises upon their second visit to the Strasser home that day. Based upon the videotape of E.K., the ALJ concluded that Joe Strasser involved himself in Petitioner's business. Additionally, the ALJ found that because Strasser had left several messages for Palermo at her office, Strasser had obviously been in contact with either her husband or the nanny and could have allowed access through them.

Petitioner complains that the testimony does not establish that it was Strasser's husband who spoke to Palermo and Coleman, as opposed to her father-in-law. While we agree that there was confusion as to which Joe Strasser approached Palermo and Coleman, Palermo testified that the individual with whom they spoke was Strasser's husband. Palermo's identification of Strasser's husband was repeated when she testified that Joe Strasser remained in the office while Palermo was reviewing case files. (R.R. 464a)

Petitioner further complains that the ALJ erred in concluding that since Strasser left several messages for Palermo at her office on January 6, she could have arranged for DPW to have access to the facility. Petitioner claims that this finding ignores evidence that Strasser was handling the return of E.K. from the Daniels family that day.

First, as noted by Coleman, he and Palermo arrived at the Strasser home during the agency's normal business hours. Additionally, Daniels testified that her husband returned E.K. to Strasser on January 6, 2003. She did not indicate that the return of E.K. occurred someplace other than the Strasser home. Finally, Strasser merely testified that she was not at home on January 6, 2003. She offered no explanation of her whereabouts or activities that day. While such evidence is subject to other interpretation, we cannot conclude that the ALJ erred in his conclusion that arrangements could have been made to accommodate Coleman and Palermo.

■ As in any case with conflicting testimony, the issue is reduced to one of credibility. Credibility and evidentiary weight are matters solely within the discretion of the fact finder, see *Arcurio v. Dep't of Pub. Welfare*, 125 Pa.Cmwlth. 557, 557 A.2d 1171 (1989), and in this case, the ALJ found the testimony of Coleman and Palermo to be more credible than that of Strasser. As an appellate court, we cannot disregard the credibility determinations of the fact finder. *Colonial Gardens Nursing Home, Inc. v. Dep't of Health*, 34 Pa.Cmwlth. 131, 382 A.2d 1273 (1978).

Petitioner further complains that the evidence does not demonstrate that it failed to provide full access to its records in violation of 55 Pa.Code § 20.34 where Strasser testified that she had a high speed copier available for DPW's use. We disagree.

Although Coleman stated that Strasser produced all the files requested, the record nevertheless supports a determination that she was obtrusive and denied DPW access. Both Coleman and Palermo testified that Strasser's attempt to copy a file was painstakingly slow because she had a fax copier. This testimony was found to be credible,

which contradicted Strasser's testimony that she had a high-speed copier. To advance matters, DPW made a reasonable request to confidentially copy the files at the Wayne County OCY, a practice used by DPW in the past. Strasser refused this request, which necessitated DPW to remain at her home for six to seven hours and to eventually secure an administrative search warrant. Hence, we cannot conclude that the ALJ erred in determining that Strasser denied DPW full access to Petitioner's records and thus, the violation should be affirmed.

## III.

■■■ In its third argument, Petitioner contends that the ALJ erred in affirming the violations based upon Petitioner's non-compliance with the ICPC with regard to E.K. Petitioner concedes, however, that if the Court sustains the determination that E.K. was placed for a disruption adoption, the violations based on the ICPC are meritorious. Relying on Strasser's and D.K.'s testimony, which was found not credible, Petitioner asserts that the no such placement was contemplated. We must disagree.

As the ALJ noted, E.K. was placed in the Strasser home for 40 days during December 2002 and January 2003. Before he left E.K. with Strasser, D.K. participated in a videotape alleging to "wake up" ten-

year old E.K. to the fact that the adoption was not going well. The K.s executed both a disruption contract (DPW Exhibit 3) and a delegation of parental authority (DPW Exhibit 4) on December 7, 2002, despite D.K.'s testimony that they were unsure as to what course of action to take. The purpose of the disruption contract was to request Petitioner to search for a permanent replacement home for E.K. If they had intended to have E.K. returned to them, the K.s would not have signed a contract seeking to place E.K. and would not have signed a blank delegation of parental authority giving a prospective adoptive family custody "until such time as the adoption of [E.K.] is finalized in the state of residence of [her] new adoptive family."[8] (DPW Exhibit 4) We further find it incomprehensible that a father would "have no problem" placing his child with complete strangers based upon his friendship with Strasser, who had minimal contacts with the Smiths and Daniels families before allowing E.K. to reside in their homes.

Without consideration of the testimony of Mr. and Mrs. Smith and Daniels, D.K.'s testimony alone is sufficient to support the ALJ's determination that he intended to place E.K. for a disruption adoption in the hands of Petitioner. As Petitioner concedes, the violations of the ICPC must stand inasmuch as we agree with the ALJ that E.K. was placed for adoption.[9]

8. Interestingly, we note that D.K. testified that E.K. was residing with her legal guardians, the Strassers, at the time of his August 28, 2003 testimony. (R.R. 517a) He was unaware of where and when the guardianship was entered and did not provide any documentation evidencing as much. If such an agreement was entered, Strasser knew the appropriate legal steps to ensure that E.K.'s presence in her home was a separate undertaking from her business ventures.

9. Because we agree with the ALJ that E.K. was placed for adoption, we need not address

Petitioner's alternative argument that it was only providing training services for interstate adoptions and thus the ICPC was not implicated. We are nonetheless troubled by this argument because it suggests that an agency can insulate itself from DPW review by failing to maintain records under the guise of "training." When Palermo and Coleman asked Strasser for client files, Petitioner produced the files subject to the ICPC regulations. She cannot now claim that the files she provided, which were found to be inadequate, are not

### IV.

■ In its fourth argument, Petitioner contends that the record does not support the ALJ's determination that Petitioner failed to keep its personnel files in accordance with DPW's regulations. Section 3680.31 of DPW's regulations, 55 Pa.Code § 3680.31, governs the personnel records of legal entities under the supervision of DPW. Personnel records are required to contain (1) a job description, (2) a copy of the medical certification required by Sections 3680.22(b)(5) and (6), 55 Pa.Code §§ 3680.22(b)(5) and (6), of those caring for and supervising children, (3) evidence of required training and education, (4) employment starting and termination dates, and (5) a signed statement by the staff person that he or she is familiar with the duties and responsibilities under the Child Protective Services Law. The agency must retain personnel records for at least five years. *Id.*

Petitioner claims that Kline's personnel file did contain the required information; however, said documentation was missing after Kline's resignation. Regardless of the reasons why the personnel files were incomplete, failure to properly maintain the files is a violation of DPW's regulations. As the agency subject to DPW's regulations, Petitioner has the duty to ensure that its files are secure and cannot be illicitly obtained. Thus, the ALJ's recommendation to affirm the violation is supported where Petitioner concedes that documents were missing.

■ Petitioner also complains that the ALJ erred in determining that a violation of DPW's regulations occurred where Kline's child abuse clearances were out of date. Petitioner claims that because Kline was employed as an administrative assistant, the clearances were not required.

Section 6344 of the the Child Protective Services Law, 23 Pa.C.S. § 6344, provides that all prospective employees of persons providing child-care services[10] must submit a Pennsylvania State Police criminal history check, a certification from DPW as to whether the employee is named in the central registry as the perpetrator of child abuse and, where the employee is not a resident of Pennsylvania, a federal criminal history check. Section 6344 does not apply to administrative or other support personnel unless their duties involve direct contact with children. *Id.*

Kline testified that she was hired as the program director for Bulgarian adoptions, which Petitioner's business was to expand to include, and her employment application verifies that this is the position she sought. (DPW Exhibit 19) Strasser testified that Kline was hired as an administrative assistant. Nevertheless, Petitioner's policy and procedures manual states that it will obtain state and federal background investigations of *staff persons*, which in any scenario, would include Kline. (Exhibit C–12)

Regardless, Petitioner also failed to obtain a federal criminal history for Palakanis, which is a clear violation of the Child Protective Services Law. *See* 23 Pa.C.S. § 6344(b)(3). Strasser again suggests that

---

adoption files because she merely provided training services.

10. Section 6303(a) of the Law, 23 Pa.C.S. § 6303(a), defines "child-care services" as: Child day-care centers, group and family day-care homes, foster homes, adoptive parents, boarding homes for children, juvenile detention center services or programs for delinquent or dependent children; mental health, mental retardation, early intervention and drug and alcohol services for children; and other child-care services which are provided by or subject to approval, licensure, registration or certification by [DPW]. . . .

Palakanis removed the files prior to her resignation; however, Strasser was found to be not credible. *Arcurio.*

■ Petitioner further complains that the ALJ erred in concluding that it failed to obtain criminal history and child abuse clearances for the Smith and Daniels families inasmuch as E.K. was never placed for adoption. As previously noted, the ALJ found the testimony of Mr. and Mrs. Smith and Daniels to be credible where they each testified that they intended to adopt E.K. and rejected Strasser's testimony to the contrary. Thus, inasmuch as they were prospective adoptive parents, Petitioner was required to obtain criminal history and child abuse clearances for the Smiths and Danielses. 23 Pa.C.S. § 6344(a) (requirement of criminal history record from State Police and certificate regarding sexual offender registry applicable to prospective adoptive parents). We therefore discern no error in the ALJ's determination that the violation should be sustained.

### V.

■ Petitioner argues that the ALJ's determination to sustain the violation for failure to provide after-placement care in compliance with Section 3350.13(i) of DPW's regulations, 55 Pa.Code § 3350.13(i), was in error because E.K. was never placed for adoption. Section 3350.13(i) provides that a minimum of three supervisory visits shall be made with the child and the adoptive parents during the six-month residency requirement before final adoption. While we disagree with Petitioner's rationale, we agree in part that the violation was improperly sustained with regard to E.K.

We have continually agreed with the ALJ's determination that Petitioner sought to place E.K. with the Smiths and Danielses for adoption purposes. Nevertheless, the time frame involved does not allow for Petitioner to have engaged in supervisory visits. E.K. lived with the Smith family for four days and the Daniels family for a mere two days. Thus, any violation based on Petitioner's failure to conduct supervisory visits with regard to E.K. is not sustainable.

■ That is not to say, however, that the remaining violations based on Section 3350.5 of the regulations, 55 Pa.Code § 3350.5, are without merit. Petitioner was cited for failing to have written agreements when more than one service provider is involved in an adoption plan and for failing to provide either directly or indirectly the availability of counseling to the natural parents, the child, or the adoptive parents. 55 Pa.Code § 3350.3(b) and (e).

Petitioner readily admitted that she did not have a written list of counseling providers. Section 3350.5(a) of DPW's regulations provides that the service provider must have written policies and procedures governing adoption services. Thus, Petitioner's admission that she provides no written list of counseling services supports DPW's citation.[11]

---

11. Petitioner also references the ALJ's conclusion that Petitioner was the "sending agency" in the private adoption of H.D. and thus, was in violation of the ICPC. Under the ICPC, a "sending agency" is defined, in relevant part, as a "person [or] corporation ... which sends, brings or causes to be sent or brought, any child to another party state." 62 P.S. § 761, Art. II. In this case, the ALJ noted that Strasser admitted to providing counseling services to H.D.'s adoptive parents, that H.D.'s picture appeared on Petitioner's website, and that Petitioner received funds from the adoptive parents. We conclude that this is sufficient evidence upon which the ALJ could make the conclusion that Petitioner acted as the sending agency in H.D.'s adoption.

## VI.

 Petitioner further maintains that the ALJ erred in sustaining the violation based on its failure to comply with Section 3680.61(f) of the regulations, 55 Pa.Code § 3680.61(f), which requires an annual audit. Petitioner has been incorporated since 2001; it submitted its first audit to DPW on June 16, 2003. Thus, Petitioner's claim is without merit.[12]

## VII.

 Finally, Petitioner claims that it should have been provided an opportunity to submit a corrective plan. We disagree. Petitioner had received two provisional licenses. To reiterate, a provisional license is granted where the applicant has substantially but not completely met the applicable statutes, ordinances and regulations. Any provisional license beyond the first one is discretionary. *Miller Home, Inc. v. Dep't of Pub. Welfare*, 124 Pa. Cmwlth. 198, 556 A.2d 1 (1989). Where, as here, the decision of the licensing agency is discretionary, the Supreme Court has stated that our standard of review is limited to determining whether the agency abused its discretion. *Slawek v. State Bd. of Med. Educ. and Licensure*, 526 Pa. 316, 586 A.2d 362 (1991); *Second Breath v. Dep't of Pub. Welfare*, 731 A.2d 674 (Pa. Cmwlth.1999). In such cases, the agency's determination will not be overturned absent "bad faith, fraud, capricious action or abuse of power...." *Slawek*, 526 Pa. at 321, 586 A.2d at 365.

Because there were numerous violations found by DPW which are supported by the evidence, we cannot conclude that DPW acted fraudulently, capriciously, in bad faith or with an abuse of power.

Accordingly, we affirm. *See Arcurio* (a single violation of DPW's licensure regulations is sufficient to justify a denial of a license); *Pine Haven Residential Care Home v. Dep't of Pub. Welfare*, 99 Pa. Cmwlth. 1, 512 A.2d 59 (1986).

## ***ORDER***

AND NOW, this 7th day of June, 2005, it is hereby ordered that the May 27, 2004 order of the Department of Public Welfare is AFFIRMED.

---

12. Petitioner maintains that since this violation was the subject of a previous inspection and was addressed by an expired correction plan, it should not have been included in the current violation summary. We find no authority that provides that DPW cannot cite an agency for a continuing violation.