IN THE COMMONWEALTH COURT OF PENNSYLVANIA

P.T.,                                    :    **SEALED CASE**
                        Petitioner       :
                                         :
                v.                       :
                                         :
Department of Human Services,            :    No. 851 C.D. 2015
                        Respondent       :    Argued: April 12, 2016


BEFORE:    HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE JAMES GARDNER COLINS, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                              FILED: May 4, 2016


        P.T. petitions this Court for review of the Department of Human

Services (DHS) Secretary's (Secretary) May 5, 2015 Final Order setting aside the

Bureau of Hearings and Appeals' (BHA) decision expunging P.T.'s indicated report[1]

of child abuse from the ChildLine & Abuse Registry (ChildLine Registry).[2]    The

_____

        [1] Section 6303(a) of the Child Protective Services Law (Law) defines an "indicated report"
as a report issued by DHS or a county agency if it "determines that substantial evidence of the
alleged abuse by a perpetrator exists based on any of the following: (i) [a]vailable medical
evidence[;] (ii) [t]he child protective service investigation[; or,] (iii) [a]n admission of the acts of
abuse by the perpetrator."  23 Pa.C.S. § 6303(a); *see also* Section 3490.4 of DHS' Regulations, 55
Pa. Code § 3490.4.
        [2] Section 3490.4 of the DHS Regulations defines "ChildLine" as

        [a]n organizational unit of [DHS] which operates a Statewide toll-free
        system for receiving reports of suspected child abuse established
        under [S]ection 6332 of the [Child Protective Services Law (Law)]
        (relating to establishment of Statewide toll-free telephone number),
        refers the reports for investigation and maintains the reports in the
        appropriate file. . . .

55 Pa. Code § 3490.4.  "The ChildLine Registry is maintained in accordance with the [Law.]" *In
re: S.H.*, 96 A.3d 448, 450 n.2 (Pa. Cmwlth. 2014).

issue before this Court is whether there was substantial evidence to support the Secretary's Final Order maintaining P.T.'s indicated report on the ChildLine Registry.

On December 18, 2013, Washington County Children and Youth Services (CYS) received an oral report alleging that P.T. mentally abused his son, Pa.T. (born on October 31, 2000), from January 1, 2007 to December 18, 2013. CYS conducted an investigation and, on January 29, 2014, filed an indicated report against P.T. as a perpetrator of abuse against Pa.T. P.T. appealed. Hearings were held on October 9 and 14, 2014 before an Administrative Law Judge (ALJ).[3]

On February 13, 2015, the ALJ issued an adjudication and recommendation sustaining P.T.'s appeal and expunging his indicated report from the ChildLine Registry. On February 24, 2015, the BHA adopted the ALJ's recommendation in its entirety. CYS requested the Secretary to reconsider the BHA's decision, which was granted on March 17, 2015. On May 5, 2015, the Secretary set aside the BHA's decision. P.T. appealed to this Court.[4]

Initially, Section 6341(a)(2) of the Law authorizes "the [S]ecretary to . . . expunge an indicated report on the grounds that it is inaccurate or it is being maintained in a manner inconsistent with [the Child Protective Services Law [(Law)[5]]." 23 Pa.C.S. § 6341(a)(2). "[CYS] has the burden of establishing by substantial evidence that an indicated report of child abuse is accurate. If CYS fails to sustain that burden, a request for expungement will be granted." *Bucks Cnty.*

---

[3] The ALJ's adjudication misstates that the hearings took place on August 7 and October 9, 2014. *See* P.T. Br. App. 1, ALJ Adj. at 1.

[4] CYS intervened.

"Our 'scope of review in expunction proceedings is limited to a determination of whether constitutional rights were violated, whether errors of law were committed, or whether necessary findings of fact are supported by substantial evidence.'" *K.R. v. Dep't of Pub. Welfare,* 950 A.2d 1069, 1073 n.6 (Pa. Cmwlth. 2008) (quoting *E.D. v. Dep't of Pub. Welfare*, 719 A.2d 384, 387 (Pa. Cmwlth. 1998)).

[5] 23 Pa.C.S. §§ 6301-6386.

2

*Children & Youth Soc. Servs. Agency v. Dep't of Pub. Welfare*, 808 A.2d 990, 993 (Pa. Cmwlth. 2002). Section 6303(a) of the Law defines "substantial evidence" as "[e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion."[6] 23 Pa.C.S. § 6303(a) (emphasis omitted); *see also G.V. v. Dep't of Pub. Welfare*, 91 A.3d 667 (Pa. 2014); *In re: S.H.*, 96 A.3d 448 (Pa. Cmwlth. 2014). "[W]hether [CYS'] evidence satisfied the standard set forth in the statute is a question of law." *S.H.*, 96 A.3d at 455.

P.T. argues that the Secretary erred as a matter of law by setting aside the BHA's order expunging his indicated report from the ChildLine Registry where CYS failed to prove by substantial evidence that P.T. caused Pa.T. serious mental injury as the Law defines that term. We agree.

Section 6303(b.1) of the Law provides in pertinent part: "The term 'child abuse' shall mean intentionally, knowingly or recklessly doing any of the following: . . . (3) [c]ausing or substantially contributing to **serious mental injury to a child** through any act or failure to act or a series of such acts or failures to act." 23 Pa.C.S. § 6303(b.1) (emphasis added). "**Serious mental injury**" is defined in Section 6303(a) of the Law as:

> **A psychological condition**, as diagnosed by a physician or licensed psychologist, including the refusal of appropriate treatment, **that**:
>
> (1) **renders a child chronically and severely anxious**, agitated, depressed, socially withdrawn, psychotic or in reasonable fear that the child's life or safety is threatened; or

---

[6] This Court has stated that "'substantial evidence' in child abuse expungement cases is synonymous with the 'preponderance of the evidence' standard." *S.T. v. Dep't of Pub. Welfare, Lackawanna Cnty. Office, Children, Youth & Family Servs.*, 681 A.2d 853, 857 n.4 (Pa. Cmwlth. 1996). In *S.H,* this Court explained: "[T]he standard of proof is preponderance of the evidence, and the statutory standard of evidence in an expunction hearing is [substantial evidence]. This is the standard that governs our appellate review of the Secretary's adjudication." *Id.* at 455.

(2) seriously interferes with a child's ability to accomplish age-appropriate developmental and social tasks.

23 Pa.C.S. § 6303(a) (text emphasis added); *see also* 55 Pa. Code § 3490.4.

At the hearing, Pa.T.'s mother A.W. testified for CYS that she and P.T. shared custody of Pa.T. from January 1, 2007 through approximately November 2013, when Pa.T. refused to see his father, and neither she nor P.T. forced visitation. A.W. described that during their shared custody arrangement from January 2007 until December 2013, Pa.T. suffered from asthma and gastrointestinal (GI) upset related to anxiety, for which he treated with Pediatric Alliance, P.C. (Pediatric Alliance). She declared that, for periodic asthma flare-ups, Pa.T. has a rescue inhaler, and he uses a nebulizer for more serious episodes. A.W. explained that Pa.T. would get upset and experience stomach issues with resultant diarrhea. A.W. further reported that Pa.T. takes probiotics for his stomach, which helps.

A.W. said that since November 2013, Pa.T. has had minimal contact with P.T. and, with the exception of a stomach condition at the end of the prior school year,[7] Pa.T. did not have any stomach issues until the week before the hearing. A.W. also described that when Pa.T. gets anxious,

> [h]is personality completely changes. He doesn't sleep well. He gets dark circles under his eyes. [He b]ecomes more wanting to just stay home and not be involved with his friends. Just his whole personality changes, and he used to pick at his hands when he'd get nervous and his lips. You just see changes in him.

Reproduced Record (R.R.) at 14a. She related Pa.T.'s anxiety to P.T.'s behavior.

A.W. recounted P.T. pulling on Pa.T.'s football helmet and calling him names in front of her and other parents; referring to A.W. as a "f***ing c**t" and a

---

[7] A.W. related that Pa.T.'s doctors thought the stomach pains may have been due to an appendicitis; however, despite several tests, the cause was never established, and the pains eventually subsided.

4

"wh**re" in front of Pa.T.; making derogatory comments about A.W.'s family; referring to Pa.T.'s half-brother T.W. as a love child; getting Pa.T. a dog to break him of his allergies;[8] giving Pa.T. long lists of chores, including mowing (without a self-propelled mower) and picking up dog waste, while his friends were visiting; calling Pa.T. weak, a "p*ssy" or a "Sally"; and, referring to Pa.T. as a "f*g" because he likes to draw. R.R. at 14a-15a. A.W. also asserted that Pa.T. was forced to make his own breakfast and lunch, do his own laundry, clean the boat and the pool, and his friends no longer wanted to go to P.T.'s house. She claimed that P.T. refused to help Pa.T. with his homework, would not accept that Pa.T. suffered from asthma, and would not allow Pa.T. to have a moment's rest.

A.W. asserted that, in December 2012, P.T. struck Pa.T. for peeking at his Christmas presents and, as a result, the court issued an order prohibiting P.T. from using corporal punishment with Pa.T. A.W. also recalled that, early in November 2013, Pa.T. called from P.T.'s house and told her he was sick, but P.T. refused to help him. She stated that she took Pa.T. to the doctor, where he was diagnosed with pneumonia. Pa.T. missed school and spent two to three weeks with her as he recovered. A.W. claimed that thereafter Pa.T. no longer wanted to see P.T.

A.W. described that Pa.T. attempted to retrieve his ski equipment from P.T. on December 12, 2013 so he could go on a ski club trip, but P.T. refused to give it to him and the police were called. She testified further that P.T. cancelled Pa.T.'s ski pass, forcing A.W. to re-purchase equipment and a ski pass for Pa.T.'s trip. She recounted that Pa.T. had stress-related diarrhea for several days thereafter, although he still attended the ski trip. A.W. acknowledged that P.T. sent Pa.T. texts after December 13, 2013 – some of which were nice and others that were not. She related that P.T. texted a photo of Pa.T.'s dog Roxy with the message: "Some of us miss you.

---

[8] A.W. admitted that she too has a dog, but explained that the dog is "a non-shedding, no[-]dander hair dog." R.R. at 23a.

Still looking for you. Love you. Miss you," and a photo of Pa.T.'s cousins in front of the Christmas tree. R.R. at 25a. At some point, A.W. responded to P.T.: "You need serious help. You are so abusive to Pa.[T.]" R.R. at 24a. On December 16, 2013, A.W. took Pa.T. to see his pediatrician, Edwin B. King, M.D. (Dr. King), regarding his diarrhea.

A.W. acknowledged that she lived at approximately five different addresses between 2007 and 2013. During this time period she lived with her fiancé J.V. and his sons for three years, and her younger son T.W.'s father K.D. for a time. A.W. testified that Pa.T. never expressed anxiety due to their living arrangements.

CYS presented clinical psychologist Jennifer Eldridge, Ph.D. (Dr. Eldridge),[9] who testified that she provided individual and family counseling in 2007 for Pa.T. pursuant to a court order because his parents' co-parenting difficulties "plac[ed] him under distress." R.R. at 41a. Dr. Eldridge recalled treating Pa.T. twice

---

[9] Section 5986(b) of the Judicial Code provides, in pertinent part:

> In order to make a finding . . . that the child is unavailable as a witness, the court must determine, based on evidence presented to it, that testimony by the child as a witness will result in the child suffering serious emotional distress that would substantially impair the child's ability to reasonably communicate. In making this determination, the court may do all of the following:
>
> (1) Observe and question the child, either inside or outside the courtroom.
>
> (2) Hear testimony of a parent or custodian or any other person, such as a person who has dealt with the child in a medical or therapeutic setting.

42 Pa.C.S. § 5986(b).

As the hearing commenced, Dr. Eldridge represented that, based upon her observations, Pa.T. was unavailable to testify because of the extreme emotional reaction he would have to the proceeding. Upon witnessing Pa.T.'s breakdown (*i.e.*, consisting of crying and inability to speak) at the mention of seeing his father, the ALJ agreed with Dr. Eldridge, and ruled that Pa.T. was unavailable. *See* R.R. at 5a-12a; *see also* P.T. Br. App. 1, ALJ Adj. at 10-11.

a month from 2007, but after her 2009 maternity leave, she provided services on an as-needed basis, "pretty much based on Pa.[T.]'s level of distress." R.R. at 41a. Dr. Eldridge explained that she primarily saw Pa.T. alone, but met with the parents for a brief time at each session, and also occasionally held family counseling sessions.

Dr. Eldridge described becoming particularly concerned for Pa.T.'s well-being in 2013 when Pa.T. was distressed after a physical altercation with P.T. during Christmas 2012 that led to a court order prohibiting P.T. from using corporal punishment. She further articulated that Pa.T. suffered bouts of diarrhea and stomach problems related to P.T.'s behavior in 2013. Dr. Eldridge stated that she met with P.T. and Pa.T. on several occasions, and advised P.T. not to speak negatively about A.W., or discuss custody or support issues with Pa.T. She also recommended that P.T. seek individual counseling because he was obviously very stressed. As far as she was aware, P.T. did not use corporal punishment after issuance of the court order, and Pa.T. wished to maintain a relationship with P.T.

Dr. Eldridge reported that things appeared better for Pa.T. and she did not see him until fall 2013, when "[Pa.T.'s] GI issues were horrible. He had pneumonia. He seemed physically exhausted[.]" R.R. at 42a. She explained:

> [P.T.] no longer agreed to come to family sessions after some time in the spring, and he had written an e-mail accusing me of not calling [CYS] on [A.W.,] . . . saying that [A.W.] had Munchausen's[10] and was making all kinds of allegations against [A.W.], but I never had any concern that [A.W.] was abusing Pa.[T.], so I never called [CYS], but [P.T.] took it like we didn't have an allegiance then somehow . . . and so I didn't see him again.

---

[10]"Munchausen syndrome by proxy is a mental illness and a form of child abuse. The caretaker of a child, usually a mother, either makes up fake symptoms or causes real symptoms to make it look like the child is sick." https://www.nlm.nih.gov/medlineplus/ency/article/001555.htm.

R.R. at 42a. However, during that time Dr. Eldridge noted Pa.T. struggled with algebra and a strict teacher, for which she wrote a recommendation for Pa.T. to be transferred to a less challenging class.

Dr. Eldridge described Pa.T.'s concern about P.T's complaints that he could no longer use corporal punishment, and being fearful of P.T.'s unpredictable daily mood changes, specifically whether P.T.

> was going to be really hard on him and belligerent toward him and make him do all kinds of chores and redo the chores or criticize him about homework or predict that he was going to be a failure because of something he wasn't doing or should have done better.

R.R. at 42a. She also noted Pa.T.'s concerns regarding: P.T's warnings that A.W. may poison him, having to do chores (i.e., mowing and re-mowing the lawn) while his friends were visiting, being negatively compared to A.W., nearly being hit by a wine rack, being taken along to make child support payments, having snot blown on him in the car, a scene being made over retrieving his ski equipment for a school trip, and being criticized for his school and sports performances. Dr. Eldridge acknowledged that in 2013, Pa.T. did not have physical symptoms when she saw him in March, and although he did when she next treated him on September 24, 2013, his physical condition was better at the follow-up visit on December 19, 2013. Dr. Eldridge recounted that Pa.T.'s pneumonia gave him time away from P.T. Dr. Eldridge ultimately diagnosed Pa.T. with anxiety disorder.

Dr. King testified that he was one of several pediatricians at Pediatric Alliance who treated Pa.T. since at least 2002, when Pa.T. was diagnosed with chronic allergies and asthma. During the relevant time period, Dr. King personally treated Pa.T. in 2007 and not again until December 16, 2013.[11] Dr. King specifically

---

[11] Pa.T. was not a patient at Pediatric Alliance from 2007 to 2011, during which time his care was by another provider.

8

recalled treating Pa.T. on December 16, 2013 for watery diarrhea and rectal irritation which Pa.T. had for four days. Dr. King recalled the impression that A.W. "was accustomed to the diarrhea[,] but was coming . . . to see if [he] could do something about it." R.R. at 33a. He disclosed that because his examination did not reveal an organic or physical cause, he explored the possibility of an emotional cause.

Dr. King recorded that A.W. told him the diarrhea was related to anxiety Pa.T. experienced related to contact with P.T. Dr. King noted in his report that a "significant outlier" during that visit was that Pa.T. did not receive a birthday present from P.T. because "he did not deserve it." R.R. at 29a. Dr. King acknowledged notations in his report based upon information A.W. provided, including that: P.T. has fought Pa.T.'s asthma diagnosis, P.T. bought a dog to break Pa.T. of his asthma, P.T. is known to various community members to make loud and inappropriate comments at football events, P.T. calls kids names, P.T. discontinued Pa.T.'s ski pass, Pa.T.'s grades are poor, court ordered time with P.T., P.T knows not to leave marks, P.T. texted Pa.T. pictures of spanking, and P.T. threatened to call radio station KDKA about Dr. Eldridge.

> When asked whether Pa.T. was the victim of abuse, Dr. King declared:
>
> My opinion would be that [Pa.T.] was [at] high risk, meaning the information that I gathered significantly had merit statistically, that there was a very, in my mind, yes, very high risk that [Pa.T.'s] diarrhea was because of anxiety and his anxiety was because of [P.T.'s] statements that I was hearing.
>
> . . . .
>
> I documented, '[Pa.T.] is fairly terrified,' meaning, in my opinion, he was showing . . . physical signs of agitation. And, then I put, quote, 'When I go to see dad, he won't let me out[.]'

R.R. at 30a. Dr. King expressed his concern that Pa.T. had a "predictable illness [diarrhea] secondary to emotional abuse." R.R. at 37a. Therefore, Dr. King concluded "that [Pa.T.] shouldn't be exposed to [P.T.] until we find out if [Pa.T.'s] diarrhea is related." R.R. at 30a. Dr. King testified that, due to the serious nature of what he observed on December 16, 2013, and in an effort to be thorough and not rely solely on one party's story, he obtained a release from A.W. and contacted Dr. Eldridge.

Dr. King opined within a reasonable degree of medical certainty that since Pa.T. did not see P.T. or treat for ongoing diarrhea thereafter, Pa.T.'s anxiety-based diarrhea was related to contact with P.T. *See* R.R. at 31a. When asked whether "a mother moving in with different men who are not married and having a child with one of those men" could be a cause of anxiety-induced diarrhea in a child, Dr. King responded:

> Pretty much anything a child would have to adjust to, any major changes. Your question pertains to textbook anxiety and adjustment and irritable bowel, so anytime that the patient has to adjust to anything, any change, if they have any underlying anxiety, it's exacerbated by major changes. So that would be a more detailed question . . . for the patient because what children are anxious to is very specific.

> One child could be anxious to one thing that totally does not bother another child. So your question is could it be related to that? Yeah, it could be related to just about anything.

R.R. at 39a. Dr. King further admitted that **Pa.T.'s anxiety-induced diarrhea was not chronic**, and was not recorded in Pa.T.'s records after his December 16, 2013 visit.[12] *See* R.R. at 39a.

---

[12] Dr. King acknowledged that although Pa.T. was treated at Pediatric Alliance in March 2014 for a sinus infection and gastroenteritis accompanied by diarrhea, that episode was related to an infection rather than anxiety.

10

CYS caseworker A. Beck (Beck)[13] testified that she investigated the report that P.T. was abusing Pa.T. She described interviewing Pa.T., A.W., Dr. King, Dr. Eldridge and P.T.[14] She specifically recalled A.W. reporting P.T.'s verbal abuse of Pa.T. that made Pa.T. ill,[15] Dr. King telling her that Pa.T. presented to him with complaints of severe diarrhea, Dr. Eldridge describing that Pa.T. suffered from anxiety for about four years due to P.T.'s behavior, and P.T. denying any abuse. She explained that she always assumes the child is telling the truth and, since the information she received from Dr. King, Dr. Eldridge and A.W. correlated with Pa.T.'s statement, she completed a DHS Form CY-48 (Child Protective Service Investigation Report), *see* R.R. at 77a-78a, in which she represented that there was substantial evidence that P.T. emotionally abused Pa.T. Beck acknowledged that she was not aware of any claim of a serious interference with Pa.T.'s ability to accomplish age-appropriate developmental and social tasks. *See* R.R. at 59a.

In defense, P.T. produced records and testified[16] that he texted and/or sent Pa.T. photos daily from summer 2013 through December 2013. He recalled that after sending a photo of Pa.T.'s cousins with the Christmas tree, Pa.T. responded with an uncharacteristically-worded message and then concluded: "That's messed up. You're being abusive." R.R. at 97a.

P.T. admitted that in December 2012 he discovered Pa.T. sneaking into P.T.'s closet and opening his Christmas presents after he had been told several times to stay out of the closet, and he "made a mistake," R.R. at 104a, and "[he] grabbed

---

[13] The ALJ's adjudication misstates that CYS caseworker Maria Garcia testified for CYS. *See* P.T. Br. App. 1, ALJ Adj. at 5.

[14] Beck also interviewed Pa.T.'s Godmother and cousin, C.H., who was present when Beck spoke with P.T.

[15] Beck could not recall the specifics of what A.W. told her.

[16] P.T. also provided testimony from P.M. (Pa.T.'s former wrestling coach), C.H. (Pa.T.'s Godmother/cousin), K.V. (P.T.'s friend), and neighbors Li.D. and K.B. The ALJ did not make specific findings regarding their testimony.

him and [he] sen[t] him to his room and, as [Pa.T.] was walking through the room, [he] gave him a kick in the butt with [his] foot." R.R. at 105a. He admitted that "[he] could have handled that better." R.R. at 105a. P.T. related that there was a CYS complaint filed against him for that incident and, despite that it was deemed unfounded, a court order was issued prohibiting corporal punishment against Pa.T. He pronounced that Pa.T. did not seem to be disturbed by the incident, even going so far as to switch visitation dates so he could go skiing with P.T., and they took a ski trip to Colorado together in March 2013. P.T. declared that, shortly after that, in May or April 2013, Pa.T. was distressed because Pa.T. had been listed as a witness to testify in support of a CYS report against T.W.'s father.

In regards to the summer 2013 wine rack incident, P.T. stated that the rack fell over when he bumped it with the door, but that Pa.T. was in an adjoining room and was in no danger of being hurt. Relative to math, P.T. stated that Pa.T. was in honors math beginning September 2013, but began earning Cs and complaining that the teacher was too hard. P.T. asserted that Pa.T. needed to put in more effort, and worked with him to improve, but then P.T. received notice that Pa.T. had been transferred to a lower level math class. He admitted that he emailed Dr. Eldridge regarding his objection to her recommendation to transfer Pa.T. He also notified Dr. Eldridge that A.W. moved her and Pa.T.'s home 11 times in 12 years, and that Pa.T. was going to have to testify at CYS proceedings related to his half-brother. P.T. explained that he did not refuse to see Dr. Eldridge with Pa.T., but that since only A.W. was authorized by court order to handle Pa.T.'s medical affairs, he would have been held in contempt.

With respect to the December 2013 ski equipment incident, P.T. testified that since Pa.T. had missed approximately three weeks of school in November due to his pneumonia, and had a significant amount of homework and 13 tests to make up before the Christmas break, he did not think it was appropriate for Pa.T. to take an

entire weekend away for a ski trip. He related that the police were called to his home when A.W. attempted to get the equipment, but it was because she was sitting in her car incessantly honking the horn and a neighbor complained. He said he saw Pa.T. skiing that weekend, and he looked fine, but yet Pa.T. reported to the doctor just days later that he had watery diarrhea for those four days.

P.T. averred that Pa.T. never expressed to P.T. that he was stressed or nervous, or had stomach issues or diarrhea. He claimed that during the ski equipment incident, Pa.T. expressed to P.T. his stress about his mother moving in with her boyfriend. P.T. asserted that he never degraded Pa.T., either during sports or any other time. Rather, they had spent significant time boating, water skiing, swimming, riding motor cross, playing ball, skiing and wrestling. He stated that Pa.T. was an amazing athlete. P.T. admitted that he and A.W. disagreed about sports, and that Pa.T. has quit all of his activities and sits alone at lunchtime in school. He was aware that A.W. blocked him, Pa.T.'s relatives and friends from his phone, thereby alienating him from everyone. He further expressed that he liked when Pa.T. was busy outside, rather than playing video games inside, so he limited screen time. P.T. reported that he has always given Pa.T. what he wanted and has never failed to give him birthday presents.

P.T. denied that he ever spoke about A.W. in the manner she claimed, and specified that a February 2013 court order, that P.T. sought, prohibited both parents from saying anything disparaging about the other, and from involving Pa.T. in support, custody or financial discussions. He acknowledged that Pa.T. had chores to do at his house, including mowing the lawn with a riding mower. He related that, on one occasion, when Pa.T. failed to put the grass collector on the lawn mower as he mowed, which left clippings in the yard, he made Pa.T. go back and pick up the grass. P.T. also recalled making Pa.T. clean out the boat after a trip, and requiring that Pa.T. and his friends clean up after themselves when they finished in the pool.

13

He stated that Pa.T. did not have to clean the pool, since they have a machine that does it, but he had instructed Pa.T. to put the machine in the pool. He maintained that Pa.T. did not make his own breakfast, nor did his own laundry, except for putting his clean clothes away; however, he may have made his own lunch on occasion. P.T. recalled Pa.T. complaining about having to do chores at P.T's house, that he does not have to do at A.W.'s house. He explained that, with the exception of one of Pa.T.'s friends who was asked to leave when he was disrespectful to P.T., Pa.T.'s friends were welcome at P.T.'s home and still use the pool.

Psychologist Foster Hutchinson, Ph.D. (Dr. Hutchinson) testified that he treated P.T. from September to December 2002, also from May to September 2007, and then again in January 2014.[17] Dr. Hutchinson described that the general theme of their 2007 sessions was "trying to assist [P.T.] with the emotional distress he was experiencing with ongoing divorce and child custody proceedings," R.R. at 64a, and P.T.'s paternity. *See* R.R. at 69a. Dr. Hutchinson described that P.T.'s relationship with Pa.T. in 2007 was positive, that they engaged in a number of activities together, especially Pa.T.'s sports.

Dr. Hutchinson reported P.T. being concerned in 2007 that Pa.T. was not exerting enough effort in sports or at school, and that P.T.'s frustration led them to argue. He also recounted that P.T. believed A.W. was undermining P.T.'s credibility and allowing Pa.T. "to get out of things and to essentially, in his opinion, underperform relative to his potential." R.R. at 67a. Dr. Hutchinson declared that, in 2007, he diagnosed P.T. with dysthymic mood disorder, "which is a . . . long-term, chronic mood disorder[.]" R.R. at 67a. Dr. Hutchinson opined that P.T.

---

[17] According to Dr. Hutchinson's testimony, P.T. also treated with him several times in 2008, but those sessions pertained to P.T.'s relationship with his then-girlfriend, rather than A.W. or Pa.T. *See* R.R. at 66a, 68a.

would be capable, as a result of his intensity and his motivation for his son to excel, to say things to his son in an attempt to motivate him to perform up to his potential that could have the undesired effect of putting additional pressure and stress on a son.

In my professional opinion, I would not define that as [] imposing psychological or mental abuse, but I do believe that some of the episodes that had been related to me had a level of intensity in attempting to have an influence on his son that could certainly have created moderate, at least, levels of stress for Pa.[T.].

R.R. at 67a; *see also* R.R. at 69a. Dr. Hutchinson related that his two January 2014 sessions with P.T. had a great deal to do with stress P.T. experienced over the December 2012 incident with Pa.T., A.W.'s relationships and whether P.T. should walk away or fight to maintain his relationship with Pa.T.

The BHA adopted, in their entirety, the ALJ's findings and conclusions, wherein the testimony of Dr. King, Dr. Eldridge and Dr. Hutchinson was deemed credible. The ALJ also found during her observations of P.T. at the hearing, that "[h]e was intense and at times he could hardly contain himself," particularly during A.W.'s testimony. P.T. Br. App. 1, ALJ Adj. at 13. The ALJ further declared that "[t]here is no question regarding causation." P.T. Br. App. 1, ALJ Adj. at 13. However, the ALJ acknowledged that P.T.'s "behavior toward [Pa.T.] was not sufficient to show [P.T.] actually caused [Pa.T.] a serious mental injury." P.T. Br. App. 1, ALJ Adj. at 14.

Moreover, the ALJ and, the BHA by adopting the same, determined that CYS failed to meet its burden of proving any of the three conditions which constitute "serious mental injury" under the Law. Relative to the first part of Section 6303(a)(1) of the Law which mandates that there be a physician or psychologist (*i.e.*, medically)-diagnosed psychological condition rendering the child "chronically and severely anxious, agitated, depressed, socially withdrawn, [and/or] psychotic," the

ALJ declared that "[a] chronic condition is one that is marked by long duration, by frequent recurrence over a long time, and often by slowly progressing seriousness. *Webster's Third New International Dictionary* 402 (2002)," and held that since **neither Dr. King nor Dr. Eldridge diagnosed Pa.T.'s condition as chronic**, and Pa.T. quickly recovered once he stopped seeing P.T., "[Pa.T.]'s condition is not chronic[.]" P.T. Br. App. 1, ALJ Adj. at 14.

With respect to the second part of Section 6303(a)(1) of the Law, which requires the presence of a medically-diagnosed psychological condition rendering the child in "reasonable fear that [his] life or safety is threatened", the ALJ held: "**There was no evidence to suggest [P.T.]'s conduct caused [Pa.T.] reasonable fear that his life or safety was threatened**." P.T. Br. App. 1, ALJ Adj. at 14 (emphasis added).

Relative to the requirement in Section 6303(a)(2) of the Law that there exist a medically-diagnosed psychological condition that "seriously interferes with a child's ability to accomplish age-appropriate developmental and social tasks[,]" the ALJ held:

> **CYS did not demonstrate sufficient facts under subsection (2) that [Pa.T.]'s condition caused a serious interference with his ability to accomplish developmental and social tasks appropriate for his age**. In December 2013, [Pa.T.] chose to no longer see [P.T.] Since that time, [Pa.T.] has been living with [A.W.] and according to Dr. King and Dr. Eldridge[,] he is better physically and mentally. There was some testimony offered demonstrating that during the time period in question[, Pa.T.] had to plan activities around his ability to access a bathroom due to the GI issues that were manifesting from his anxiety disorder. However, [**Pa.T.**] **did continue to participate in those activities and there is no evidence to show [Pa.T.] at this point is anything but a normal 14-year-old boy.** Although [Pa.T.]'s grades did suffer a bit, and he had to change math classes in the fall of 2013**, he still regularly attends school and he continues to ski**.

16

> Hence, the evidence fails to demonstrate that his condition severely interfered with his developmental and social tasks appropriate for his age.

P.T. Br. App. 1, ALJ Adj. at 13-14 (emphasis added).

Accordingly, the BHA also adopted the ALJ's conclusion:

> **CYS did not present substantial evidence that [P.T.]'s abusive behavior caused [Pa.T.] a serious mental injury**. Therefore, [CYS] has not been able to present substantial evidence to support its decision to file an indicated report of child abuse against [P.T]. Accordingly, for all the foregoing reasons, the [ALJ] recommends the appeal of [P.T.] be sustained.

P.T. Br. App. 1, ALJ Adj. at 14 (emphasis added).

"In expungement proceedings, [the BHA] is the ultimate fact finder with authority to make determinations of credibility." *F.R. v. Dep't of Pub. Welfare*, 4 A.3d 779, 781 n.3 (Pa. Cmwlth. 2010); *see also J.M. v. Dep't of Pub. Welfare*, 52 A.3d 552 (Pa. Cmwlth. 2012). "If the Secretary does not reverse any facts found by the hearing officer, these findings, if supported by substantial evidence, are binding on this Court." *1st Steps Int'l Adoptions, Inc. v. Dep't of Pub. Welfare*, 880 A.2d 24, 28 n.3 (Pa. Cmwlth. 2005). "It goes without saying that an appellate court may not find facts or reweigh the evidence." *S.H.*, 96 A.3d at 455. Accordingly, "[d]eterminations as to credibility and evidentiary weight will not be disturbed on appeal absent an abuse of discretion." *F.V.C. v. Dep't of Pub. Welfare*, 987 A.2d 223, 228 (Pa. Cmwlth. 2010) (citation omitted).

Here, the Secretary did not make new findings of fact or credibility determinations, but rather adopted the BHA's adopted findings. Notwithstanding, the Secretary set aside the BHA's decision and reinstated P.T.'s indicated report, stating only:

> **Based upon the relatively detailed findings of fact within the [A]djudication and a review of the hearing**

17

> **transcript, I find that** [CYS] **has met its burden of proof** by substantial evidence that [DHS] is maintaining an indicated report of child abuse against [P.T.] in a manner which is consistent with [DHS' R]egulations.

P.T. Br. App. 2, Final Order (emphasis added). Because the Secretary arrived at a different conclusion based on the same findings of fact, the issue is whether, based upon the ALJ's findings, the Secretary erred as a matter of law by reinstating P.T.'s indicated report on the ChildLine Registry.

Based upon our review of the record, we agree that P.T.'s parenting may have caused Pa.T. distress, as well as A.W. moving numerous times with Pa.T. and living with different men. However, we disagree that, as a matter of law, CYS has proven that Pa.T. has a "serious mental injury" under the Law. Specifically, CYS failed to offer any evidence to prove that **Pa.T. has a medically-diagnosed psychological condition rendering Pa.T. in "reasonable fear that** [**his**] **life or safety is threatened," as required by the second portion of Section 6303(a)(1) of the Law**. CYS also failed to prove that Pa.T. has a medically-diagnosed psychological condition that "seriously interferes with [his] ability to accomplish age-appropriate developmental and social tasks" as required by Section 6303(a)(2) of the Law. Accordingly, the Secretary erred in setting aside BHA's decision when CYS, as a matter of law, did not meet its burden of proof.[18]

We also find no record evidence that establishes that Pa.T. has "[a] psychological condition . . . that . . . renders [Pa.T.] chronically and severely anxious," as is legally required to establish that P.T. has inflicted "serious mental injury." 23 Pa.C.S. § 6303(a)(1); *see also* 55 Pa. Code § 3490.4. Although the Law does not define the term "chronic," this Court has held that "[w]here a court needs to define an undefined term, it may consult definitions in statutes, regulations or **the**

---

[18] We are not convinced based upon the evidence proffered that Pa.T.'s difficulties in math and/or his math class transfer are related in any way to P.T.'s conduct.

**dictionary** for guidance, although such definitions are not controlling." *Adams Outdoor Adver., LP v. Zoning Hearing Bd. of Smithfield Twp.*, 909 A.2d 469, 483 (Pa. Cmwlth. 2006) (emphasis added). *Merriam-Webster's Collegiate Dictionary* (11ᵗʰ ed 2004) defines "chronic" as "marked by long duration or frequent recurrence: not acute[.]" *Id.* at 221.

By all accounts, the stomach condition and diarrhea that accompanied Pa.T.'s anxiety was not an ongoing condition, but rather was a condition he experienced only sometimes while in P.T.'s presence. Neither Dr. King (based upon his single treatment of Pa.T. in 2013) nor Dr. Eldridge (based upon Pa.T.'s March, September and December 2013 treatments) diagnosed that Pa.T. had a chronic condition as required under the Law. *See* 23 Pa.C.S. § 6303(a)(1); *see also* 55 Pa. Code § 3490.4.

In *Luzerne County Children and Youth Services v. Department of Public Welfare*, 550 A.2d 604 (Pa. Cmwlth. 1988), this Court held:

> CYS presented the testimony of T.H.'s treating psychiatrist, Dr. Anthony Denaro. Dr. Denaro testified that T.H. did not want to return home because he felt a strong aversion to C.H. Notes of Testimony at 60. Dr. Denaro also testified that this **aversion arose out of C.H.'s attempts to impose greater discipline and supervision over T.H.** than he was accustomed to before Mr. H.'s remarriage to C.H. . . .
>
> Although Dr. Denaro testified that, of the two, C.H. was more responsible for the breakdown in their relations, **the witness did not state that C.H. caused serious mental injury to T.H.** nor that C.H. caused the child to attempt suicide. N.T. at 63. Finally, the psychiatrist testified that returning T.H. to the home of Mr. H. and C.H. would place T.H. at a risk of serious mental injury.
>
> CYS also presented the testimony of Linda Goldner, T.H.'s individual and family therapist at the hospital. Ms. Goldner testified that the relationship between C.H. and T.H. was dysfunctional, that C.H. did not want to visit T.H. in the hospital, and that Mr. H. and C.H. refused a pass to allow

T.H. to visit at home prior to his discharge. N.T. at 49, 51-52. K.A.F., T.H.'s natural mother, testified that **she has not experienced any behavioral problems with T.H. since he has come to live with her**. N.T. at 113.

After careful review of the record in this case, we conclude that the hearing officer properly determined that CYS had not met its burden of proving that C.H. had engaged in any *acts or omissions which caused* serious mental injury to T.H. **The evidence presented demonstrates *only* that T.H. had a strong aversion to C.H.** based upon C.H.'s mere presence in the home and her attempts to impose more discipline and supervision upon T.H. Section 2 of the Law[19] specifically states that the Law's provisions shall not be construed to restrict the generally[-]recognized existing rights of parents to use reasonable supervision and control when raising their children. 11 P.S. § 2202. While we are aware that returning T.H. to the home of Mr. H. and C.H. may have placed T.H. at **a risk of serious mental injury and further deterioration, this alone is not substantial evidence that C.H. was the perpetrator of child abuse against T.H.**

*Id.* at 606-07 (footnote omitted; bold emphasis added).

In *V.M., Sr. v. Department of Public Welfare* (Pa. Cmwlth. No. 1837 C.D. 2007, filed April 15, 2008),[20] this Court, citing *Luzerne County*, similarly held:

More specifically, in assessing V.M., Jr.'s condition, Dr. Kelly noted in his May 26, 2005 report that V.M., Jr.'s '[p]ast history of fecal impaction, fecal incontinence, and rectal pain have all normalized.' Exhibit A–2 at 3. Dr. Kelly noted that V.M., Jr. 'does have soiling of his underclothing in association with emotional distress.' *Id.* However he also noted that '[t]his is actually compatible with irritable bowel syndrome . . . ' and that '[h]e is otherwise without symptoms and he is gaining and growing at the 90th percentile for his weight and the 25th for his

---

[19] Section 2 of the former Child Protective Services Law, Act of November 26, 1975, P.L. 438, *as amended,* repealed by Section 6 of the Act of December 19, 1990, P.L. 1240.

[20] This Court's unreported memorandum opinions may not be cited as binding precedent; however, they may be cited "for [their] persuasive value[.]" Section 414 of the Commonwealth Court's Internal Operating Procedures. *V.M.* is cited herein for its persuasive value.

height.' *Id.* In addition, in his September 13, 2005 report, Dr. Kelly noted that V.M., Jr. 'admits that the soiling occurs in association with his visits with his father . . .', that '[t]his is consistent with irritable bowel syndrome . . . ', and that '[d]espite his symptoms his growth parameters continue to advance well.' *Id.* at 5.

It is true that Dr. Kelly initially recommended that V.M., Jr. seek counseling, and that he subsequently recommended that V.M., Jr. continue his 'counseling for his feelings of anxiety and depression.' *Id.* However, **nowhere in either of these reports does Dr. Kelly diagnose V.M., Jr. as suffering from any psychological condition that renders him 'chronically and severely anxious**, agitated, depressed, socially withdrawn, psychotic **or in reasonable fear that the child's life or safety is threatened . . . ' as required under the Law. Likewise, nowhere in either of these reports, does Dr. Kelly diagnose V.M., Jr. as suffering from a psychological condition that 'seriously interfere**[d] **with** [his] **ability to accomplish age-appropriate developmental and social tasks . . . ' as required under the Law.**

*V.M.*, slip op. at 3-4 (footnote omitted; emphasis added).

More recently, in *B.B. v. Department of Public Welfare* (Pa. Cmwlth. No. 1214 C.D. 2009, filed March 22, 2010),[21] citing *Luzerne County*, this Court held:

We do not condone B.B.'s use of abusive language to C.B. even during heated arguments. Indeed, we have no quarrel with CYS's removal of C.B. from B.B.'s custody in light of her abusive behavior, which undoubtedly *could* lead to chronic psychological problems. However, her **abusive verbal behavior alone is insufficient to establish that she actually *did cause* a serious mental injury** to C.B. As Cochran conceded, C.B.'s **psychological condition was transient, not chronic as required by Section 6303(a) of the Law.** C.B. did not receive treatment for his condition and quickly recovered from it once he started living with his paternal grandmother and father. The evidence also fails to demonstrate that his condition severely interfered with his developmental and social tasks appropriate for his age.

[21] *B.B.* is cited herein for its persuasive value, pursuant to Section 414 of the Commonwealth Court's Internal Operating Procedures.

21

> Although B.B. told Dr. Cochran that his grades suffered 'a little bit,' he testified that his schoolwork was 'not really' affected while he was in B.B.'s custody; he continued to participate in many sport and music activities and 'regularly attend[ed] the youth group' events. R.R. at 10a, 13a and 107a. CYS did not allege, and nothing in the record suggests, that B.B.'s conduct placed him in reasonable fear that his life or safety was threatened.

*B.B.*, slip op. at 6 (bold emphasis added).

"[N]owhere . . . [is there any evidence that Pa.T. is] suffering from any psychological condition that renders him 'chronically and severely anxious, agitated, depressed, socially withdrawn, psychotic or in reasonable fear that [his] life or safety is threatened . . . ' as required under the Law." *V.M.*, slip op. at 4. Thus, here,

> [a]s in in *Luzerne County,* the evidence presented by CYS is insufficient to establish that [P.T.]'s conduct, however hurtful and inappropriate, caused a serious mental injury to [Pa.T.], as defined by the Law. Because the record establishes that CYS failed to meet its burden of proving that [P.T.] was the perpetrator of child abuse, []he is entitled to have the indicated report expunged pursuant to Section 6341 of the Law. . . .

*B.B.*, slip op. at 7.

Therefore, the Secretary's Final Order is contrary to the Law. Accordingly, the Secretary's Final Order is reversed and the case is remanded for DHS to expunge from the ChildLine Registry the indicated report of child abuse naming P.T. as a perpetrator.

_____
ANNE E. COVEY, Judge

<u>IN THE COMMONWEALTH COURT OF PENNSYLVANIA</u>

| | | |
|---|---|---|
| P.T., | : | **SEALED CASE** |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| Department of Human Services, | : | No. 851 C.D. 2015 |
| Respondent | : | |

<u>O R D E R</u>

AND NOW, this 4th day of May, 2016, the Department of Human Services (DHS) Secretary's May 5, 2015 Final Order is reversed, and the case is remanded for DHS to expunge from the ChildLine & Abuse Registry the indicated report of child abuse naming P.T. as a perpetrator.

Jurisdiction is relinquished.

_____
ANNE E. COVEY, Judge