IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Darrell J. Campbell,                        :
                              Petitioner    :
                                            :
              v.                            :
                                            :
State Civil Service Commission              :
(Department of Corrections),                :    No. 382 C.D. 2017
                              Respondent    :    Argued: December 7, 2017


BEFORE:   HONORABLE ROBERT SIMPSON, Judge
          HONORABLE ANNE E. COVEY, Judge
          HONORABLE DAN PELLEGRINI, Senior Judge


OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                                 FILED: December 28, 2017


              Darrell J. Campbell (Campbell) petitions this Court for review of the
State Civil Service Commission's (Commission) March 3, 2017 adjudication and
order (Adjudication) dismissing his appeal challenging the Department of
Corrections' (Department) termination of his employment from his Corrections
Officer 3 position at State Correctional Institution at Rockview (Rockview).  There
are five issues before the Court: (1) whether the Commission's findings are supported
by substantial evidence; (2) whether the Commission erred by refusing to compel
production of an unredacted pre-disciplinary conference (PDC) synopsis (Synopsis);
(3) whether the Department had just cause to discharge Campbell; (4) whether the
Commission erred by refusing Campbell's request to compel testimony; and (5)
whether the Commission erred by disregarding mitigation as an optional remedy.
After review, we affirm.

Campbell began his employment with the Department on December 22, 2006. On July 19, 2015, Campbell was the Lieutenant assigned to Rockview's Secure Residential Treatment Unit (SRTU).[1] In that capacity, Campbell supervised Corrections Officers Brian McFee (McFee) and Nathan Heverly (Heverly). On that date, Campbell entered the dayroom,[2] witnessed a confrontation between two inmates (Incident) and called McFee to the scene. At the time, McFee was in the SRTU control bubble (Bubble). When McFee arrived, the confrontation was in progress, and McFee assisted in separating the inmates, restraining one inmate with handcuffs and escorting him back to his cell. Thereafter, Campbell directed McFee to complete an incident report (DC-121). McFee did so, and included a statement that he was hanging up a set of keys when Campbell called him to respond to the confrontation. McFee submitted the DC-121 to Campbell who directed him to remove the statement about hanging up the keys because it was either irrelevant or created the appearance that McFee did not timely respond. McFee removed the statement and resubmitted the DC-121. During the Department's subsequent investigation into the July 19, 2015 events, McFee stated that he was hanging up keys when Campbell called him.

Heverly was also in the Bubble when the Incident occurred. After the Incident, Campbell also directed Heverly to write a DC-121. In his DC-121, Heverly wrote that the Incident involved an unplanned use of force and described the Incident as "inmate on inmate" because two inmates were fighting. Another Corrections Officer, Craig Rutherford (Rutherford), the SRTU Sergeant on duty at the time of the Incident, overheard Campbell direct Heverly to change his DC-121 report to describe that there had been a fight rather than an assault. Rutherford observed Heverly change his DC-121 and discard the original. Rutherford also wrote inmate

---

[1] The SRTU is a unit for housing and treating inmates with mental health issues.
[2] The dayroom is directly outside the control bubble (Bubble). The Bubble is a room for staff which is "surrounded by glass so that [staff] can see out of the [B]ubble." Certified Record (C.R.) Item 1, Notes of Testimony, April 28, 2016 N.T. at 117.

2

misconduct reports for both inmates after gathering information from Campbell and the other Corrections Officers present during the Incident.

Corrections Officer Howard Hoover (Hoover) was assigned to investigate inmate abuse allegations arising from the Incident. Specifically, one of the inmates involved in the Incident alleged that two Corrections Officers had slammed his head into the floor while he was being restrained. *See* Certified Record (C.R.) Item 1, Notes of Testimony, April 28, 2016 (N.T.) at 115. During the investigation, Hoover reviewed the DC-121 reports and noted that they were unusually short. He interviewed the inmates and all staff involved with the Incident. On August 13, 2015, Hoover interviewed Heverly, who told him that his original DC-121 reported that the two inmates were fighting and he placed one inmate on the ground. Heverly informed Hoover that Campbell had directed him to modify his DC-121 to state that both inmates were already on the ground and that he merely handcuffed them. Heverly advised Hoover that he had submitted a modified DC-121. Hoover also spoke with McFee who informed Hoover that he was hanging up keys when Campbell called him to the scene of the Incident.

In addition, Hoover interviewed Campbell. Campbell focused on the fact that when the Incident occurred he was preparing to respond to another incident. Hoover also asked about whether a television was inside the Bubble at the time of the Incident, as reported by one of the inmates. Campbell repeatedly stated that he did not recall whether a television was in the Bubble at the time of the Incident. At the end of the interview, Hoover requested Campbell to provide a written statement about the Incident. Campbell provided the written statement, but Hoover later realized that the statement did not include any mention of whether a television was present in the Bubble. Accordingly, Hoover re-interviewed Campbell so the matter could be addressed and included in the written statement. Campbell provided a second written statement acknowledging the presence of a television in the Bubble.

Upon completing his investigation, Hoover determined that the Incident should have been reported as an inmate-on-inmate assault and an unplanned use of force, since an inmate was taken to the ground, but Campbell directed staff to omit that information. Additionally, although Hoover believed that Campbell responded immediately upon discovering the Incident, he faulted Campbell because staff had not maintained constant dayroom observation, in violation of Security Post Orders.

On September 28, 2015, the Department held a PDC attended by Deputy for Facilities Management Eric Tice (Tice), Major Daniel Baird (Baird) and Human Resources representative Mandy Confer (Confer). On October 26, 2015, Tice issued the Synopsis to Rockview Superintendent Mark C. Garman (Garman/Superintendent). Campbell retained his duties during the investigation, but was precluded from supervising the SRTU.

By December 8, 2015 letter (Letter), the Department notified Campbell that he was discharged from his position as Corrections Officer 3, regular status, effective December 9, 2015. The Letter further notified Campbell that, following the PDC, the Department determined that Campbell had violated the following:

> **PA DOC Code of Ethics, B#22**
> An employee shall submit any necessary and/or requested work[-]related reports in a timely manner and in accordance with existing regulations. Reports submitted by employees shall be truthful[,] and no employee shall knowingly enter or cause to be entered any inaccurate, false, or improper information or data, or misrepresent the facts in any Department record or report.
>
> **PA DOC Code of Ethics, B#29**
> All employees shall comply and cooperate with internal investigations conducted under the authority of the Department [], and respond to questions completely and truthfully[.] Procedure in cases that may result in criminal prosecution will include those rights accorded to all citizens of the Commonwealth.

**Failure to Perform your Job**
Essential functions of a Corrections Officer 3 is to have the ability to supervise correctional staff in all work activities, exercise care[,] custody and control over inmates, effectively communicate verbally and in writing with inmates and staff, enforce rules and regulations of the Department [] and facility, accurately complete all required Department [] forms.

**DC-ADM 801 Section 1(B)(2)**
The **DC-141, Part 1** shall be written by either the charging staff member or contract service provider who has personal knowledge of the rule violation. On an as-needed basis, the **DC-141, Part 1** may be written by a staff member at the direction of a person who has personal knowledge of the misconduct; in such cases, the **DC-141** must include a justification as to why the individual with personal knowledge did not write the report.

**DOC Policy 6.3.1 Section 32(E)(4)(d)**
Written reports, using the **DC-121, Part 3, Employee Report of Extraordinary Occurrence**, are required from the person who applied the force and from every staff member who witnessed or were involved in the incident. These reports shall be submitted to the Shift Commander no later than the end of the *duty day*. The report must include all of the following information.
[. . . .]

> d.) an accurate and complete description of the incident and reasons for deploying force

Reproduced Record (R.R.) at 3a-4a. In the Letter, the Department specifically charged:

> [O]n July 19, 2015 you were the Lieutenant that was assigned to the SRTU. You stated that you witnessed a fight between Inmate HB2679 Williams and Inmate JZ6093 Dixon and called for assistance. You agreed that you failed to perform your job and that you violated DC-ADM 801 Section 1(B)(2). You also admitted that you did not know the policy concerning the SRTU and you were not up-to-date on the post orders.

5

Additionally, your DC-121 misrepresented the facts and was not a complete description of the incident and you failed to insure that the Officer's DC-121s were accurate. Moreover, you instructed an Officer to change his DC-121 report to coincide with the other reports. You failed to review the reports for completeness and follow-up on the incident prior to submitting the reports to the Shift Commander. Furthermore, your response concerning a [television] in the SRTU Bubble has been inconsistent throughout the course of the investigation.

Your failure to direct the work force and follow proper procedures and policies left an inmate severely beaten to where he needed emergency outside treatment. Your blatant disregard for policy and procedure is unacceptable and cannot be tolerated.

R.R. at 4a-5a.

On December 11, 2015, Campbell appealed to the Commission. The Commission held a hearing on April 28, 2016. The Department presented the testimony of McFee, Heverly, Rutherford, Hoover, Baird and Confer that Campbell directed subordinates to alter their DC-121 reports, that Rutherford completed the inmate misconduct forms, and that Campbell failed to perform his duties and truthfully and completely cooperate in the Department's investigation. Specifically, McFee testified that Campbell had directed him to change his DC-121 report to remove information that McFee was hanging his keys when the Incident occurred. *See* N.T. at 36-37. Heverly also stated that Campbell had directed him to change his DC-121, explaining: "[In] my original report[,] I wrote that there was two inmates fighting and I placed Inmate Dixon on the ground. I was asked [by Campbell] to change it to make it as if the inmates were already on the ground and I just walked up and handcuffed them." N.T. at 60-61. Rutherford testified that although he had no involvement in the Incident, he completed the inmate misconduct forms based on information provided by Campbell and the other Corrections Officers. *See* N.T. at 82-83.

6

Hoover stated as a result of his investigation he concluded:

> that this [I]ncident should have been --- one, it should have been reported as an inmate-on-[i]nmate assault. Two, it should have been reported as an unplanned use of force, because the inmate was taken to the ground. And he wasn't --- he didn't put his arms behind his back and say, [h]ere, put the handcuffs on me.
>
> And they didn't say, [b]reak up the fight; and the inmates didn't stand back and break up the fight. They used force to break up the inmates.
>
> What the true, accurate account of the situation is, I'm not sure we still know, because not everybody was truthful throughout the investigation and weren't truthful in their initial reports.
>
> I concluded that there were violations by several staff members and also that there was a lack of supervision on the unit and direction [by Campbell].
>
> . . . .
>
> [Campbell] had nobody assigned to directly observe the inmates in the dayroom area. To this day, nobody can explain how one inmate got out of a secure holding cell, whether he got . . . out on his own will or whether he was pulled out of the cell. The only account of that specifically I got from the inmates.

N.T. at 115-116. Baird explained that "[t]he fact that staff members were instructed to change their [DC-]121s, we found that to be less than truthful. It was misrepresented as just a fight and not an unplanned use of force. Obviously, that's less than truthful." N.T. at 188. Finally, Confer testified that she was on the 3-member PDC panel, and that the panel unanimously substantiated all of the charges, but did not recommend any specific discipline. *See* N.T. at 227-228.

Campbell testified on his own behalf. He stated that he accurately reported in his DC-121 what he had witnessed during the Incident. Campbell explained that at the time of the Incident, he had just returned from eating.

7

According to Campbell, a medical emergency was reported on the radio, and Campbell prepared to respond by gathering his radio. He looked up and observed the Incident. When he discovered the Incident, he thought it was a fight, and yelled out to other Corrections Officers for assistance. He attempted to review video to learn more about what had transpired, but there was no video coverage of the Incident. He contended that the characterization of the Incident as an inmate-on-inmate fight was accurate based on what he witnessed. He further testified that he described his observations of the Incident to the other Corrections Officers but did not tell them to change their reports. *See* N.T. at 241-243.

On March 3, 2017, the Commission issued its Adjudication, wherein it found credible Heverly's and McFee's testimony that Campbell directed them to alter their DC-121 reports. The Commission also deemed credible that Rutherford completed the inmate misconduct forms although he was not present during the Incident. The Commission also declared that Hoover's and Baird's testimony was credible. The Commission concluded: "[Campbell's] unfamiliarity with post orders, improper supervision of subordinates, and intentional omissions and misrepresentations on the DC-121 reports reflect negatively upon his competence and ability to perform his job duties." Commission Adjudication at 19. Accordingly, the Commission found that the Department had established just cause for Campbell's employment termination. Campbell appealed to this Court.[3]

---

[3] Our review of the Commission's decision is limited to determining whether the factual findings are supported by substantial evidence, whether an error of law was committed, or whether constitutional rights were violated. Whether a civil service employee's actions constitute just cause for removal is a question of law reviewable by this [C]ourt.

*Dep't of Transp. v. State Civil Serv. Comm'n (Bocchinfuso)*, 84 A.3d 779, 783 n.2 (Pa. Cmwlth. 2014) (citation omitted).

8

Campbell first argues that the Commission's findings were not supported by substantial evidence because "[t]he Commission based 37 of its 39 Findings of Fact[] on [Department] testimony that was thoroughly impeached, discredited and not credible." Campbell Br. at 7. Specifically, Campbell argues:

> The only true and **consistent** account about what happened before, during and after the inmate-on-inmate fight at [Rockview], on July 19, 2015 – **Campbell's** account – was *not once* referenced in the Commission's []Findings of Fact[] in this matter, nor did the Commission discuss or even reference or describe Campbell's largely unchallenged testimony as not credible.

*Id.* In effect, Campbell asserts that the Commission's decision is not based on substantial evidence because the Department's multiple witnesses are obviously untruthful. Essentially, Campbell contends that inconsistencies and contradictions in the Department's witnesses' testimony are so egregious that the Commission could not, under any set of circumstances, have relied upon that testimony, and, because it did so, the Commission erred. Campbell further argues that the Commission compounded its error by disregarding his "true and consistent account[.]" *Id.* (Emphasis omitted). We disagree.

"The Commission is the sole fact finder in civil service cases and has **exclusive authority to assess witness credibility and resolve evidentiary conflicts**." *Pa. Bd. of Prob. & Parole v. State Civil Serv. Comm'n (Manson)*, 4 A.3d 1106, 1113 (Pa. Cmwlth. 2010) (emphasis added). Further, "[t]he finder of fact is free to . . . reject contradicted or biased testimony as not credible." *Cambria Cty. Home & Hosp. v. Dep't of Pub. Welfare*, 907 A.2d 661, 667 (Pa. Cmwlth. 2006). **The trier of fact** "must determine the weight to be given conflicting evidence." *Baker v. Oliver B. Cannon & Sons, Inc.*, 362 A.2d 1150, 1151 (Pa. Cmwlth. 1976). Moreover, "[i]t is a well[-]settled principle of appellate review that the hearing body to whom the testimony is actually presented is in the best position to decide matters

of credibility and evidentiary weight due to the ability to observe witnesses firsthand." *Lewis v. Dep't of Health & State Civil Serv. Comm'n*, 437 A.2d 811, 814 n.7 (Pa. Cmwlth. 1981). Thus, it is beyond this Court's role to make factual findings, evaluate witness credibility, resolve evidentiary conflicts or determine evidentiary weight. Accordingly, we decline Campbell's invitation to do so.[4] Based upon a review of the record evidence, we hold that the Commission's findings were supported by substantial credible evidence.

---

[4] This Court has explained:

> [T]he fact-finder 'is not required to address each and every allegation of a party in its findings, nor is it required to explain why certain testimony has been rejected.' *Balshy v. [Pa.] State Police*, 988 A.2d 813, 836 (Pa. Cmwlth. 2010). The pertinent inquiry is whether the . . . findings are supported by substantial evidence. *Id.* 'The findings need only be sufficient to enable the Court to determine the questions and ensure the conclusions follow from the facts.' *Id.*

*Kiskadden v. Pa. Dep't of Envtl. Prot.*, 149 A.3d 380, 401 (Pa. Cmwlth. 2016). Notwithstanding,

> this Court may conclude that an adjudicator has capriciously disregarded competent evidence when the unsuccessful party below has presented 'overwhelming evidence' upon which the adjudicator could have reached a contrary conclusion, and the adjudicator has not satisfactorily addressed that evidence by resolving conflicts in the evidence or making credibility determinations that are essential with regard to the evidence. *Frog, Switch & M[fg.] Co. [v. Pa. Human Rels. Comm'n,]* 885 A.2d [655,] 667 [(Pa. Cmwlth. 2005).] . . . . In other words, where there is strong 'critical' evidence that contradicts evidence supporting a contrary determination, the adjudicator must provide an explanation as to how it made its determination. The ultimate question is whether an adjudicator 'has failed to give a proper explanation of overwhelming critical evidence.' *Id.* However, in *Frog, Switch & Manufacturing Co.*, the Court recognized the extremely unusual nature of the adjudicator's decision, in which 'each and every key finding of causation, [the Human Relations Commission] ignored evidence that would have compelled a different conclusion.' *Id.*

*Grenell v. State Civil Serv. Comm'n (Franklin Cty.)*, 923 A.2d 533, 538-39 (Pa. Cmwlth. 2007). In the instant matter, the record reveals no such overwhelming contradictory critical evidence.

Campbell next contends that the Commission erred when it refused to compel production of the unredacted Synopsis. We agree.

The Department refused to produce the Synopsis, asserting that the Synopsis was protected from disclosure under the deliberative process privilege,[5] and because it was not relevant to the proceedings. Campbell filed a motion with the Commission to compel production. By April 15, 2016 letter, the Commission notified the parties:

> A fair summary of [the Department's] response to [Campbell's] motion indicates the following. The [Department] has already produced to [Campbell's] counsel the entire record of all documents used as a basis for [Campbell's] discipline, except one. After a search was made, no emails were found to exist related to [Campbell's] request. The only document withheld by the [Department] is based on 'deliberative process privilege' a 'memorandum authored at the facility which is simply a synopsis of the [pre-disciplinary conference] which contains opinions and recommendations, as well as mental impressions.' The [Department] argues [the Synopsis] is both protected by privilege and irrelevant because the matter before the Commission is a . . . just cause hearing only [under Section

---

[5] "The deliberative process privilege permits the government to withhold documents containing 'confidential deliberations of law or policymaking, reflecting opinions, recommendations or advice.'" *Commonwealth v. Vartan*, 733 A.2d 1258, 1263 (Pa. 1999) (quoting *Redland Soccer Club, Inc. v. Dep't of the Army of the U.S.,* 55 F.3d 827, 853 (3d Cir.1995)). Further,

> [f]or the deliberative process privilege to apply, certain requirements must be met. First, the communication must have been made before the deliberative process was completed. Secondly, the communication must be deliberative in character. It must be a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters. Information that is purely factual, even if decision-makers used it in their deliberations is usually not protected.

*Vartan,* 733 A.2d at 1264 (citations and quotation marks omitted).

11

951(a) of the State Civil Service Act (Act)[6]] without a corresponding discrimination claim. Therefore, the opinions and conclusions of the pre-disciplinary panel members with regard to the evidence are irrelevant since the [Department] will defend the discipline it actually imposed and the Commission will reach its own conclusions concerning the evidence.

To the extent that [the Synopsis] contains a summary of the facts and rationale upon which the panel members' decision to recommend discipline for [Campbell] was based, that information should be provided to [Campbell's] counsel. The [Department], if it chooses to, can redact from [the Synopsis] the specific recommendation for discipline the panel made to the Superintendent, if any.

R.R. at 204a-205a.

Although Campbell contends that the Commission erred by permitting the Department to redact the Synopsis based on the deliberative process privilege, the Commission purportedly did not authorize the redaction on that basis. Instead, in an April 7, 2017 letter denying Campbell's reconsideration motion, the Commission explained:

The Commission's decision to allow the appointing authority to redact the [PDC] panel's recommendation for discipline, while otherwise compelling them to produce for you the entire document, was not based on the deliberative process privilege. If that had been the basis of our decision, the entire document would have been denied to you. The Commission allowed the red[a]ction because the [PDC] panel's recommendation was an opinion which **the Commission did not need to render its decision** on this appeal. The Commission, made its own determination of whether the evidence offered by the [Department] was sufficient to provide just cause for [Campbell's employment termination].

---

[6] Act of August 5, 1971, P.L. 752, added by Section 27 of the Act of August 27, 1963, P.L. 1257, *as amended*, 71 P.S. § 741.951(a).

C.R. Item No. 6, April 7, 2017 Letter (emphasis added). However, the Commission erred by allowing the Synopsis to be redacted. Section 105.14b(b) of the Commission's Regulations states, in relevant part: "At the discretion of the Commission, relevant documents may be obtained from an opposing party prior to the hearing." 4 Pa. Code § 105.14b(b).

Clearly, the Commission had the discretion to determine whether the Synopsis was relevant, and to order its disclosure. However, absent a privilege, once the Commission deemed the Synopsis to be relevant and directed the Department to produce it, the entire unredacted document should have been made available to Campbell for his review and consideration. Such disclosure would have permitted Campbell to argue the purported relevance of page three to the Commission. Notwithstanding, because the issue before the Commission was the Department's discipline rather than the PDC panel's recommendation, the Commission's error was harmless.

Campbell next argues that the Commission erred by concluding that the Department established just cause for his discharge. This Court has explained:

> A civil service employee may be removed from employment only for just cause. The appointing authority bears the burden of proving just cause for removal. Just cause for removal must be merit related. Merit-related criteria include whether the employee failed to properly execute his duties or has acted in such a way that hampers or frustrates the execution of his duties. The criteria must in a rational and logical way touch upon the employee's competency and ability.

*Webb v. State Civil Serv. Comm'n (Dep't of Transp.)*, 934 A.2d 178, 188 (Pa. Cmwlth. 2007) (citations omitted). "What constitutes just cause for removal is largely a matter of discretion on the part of the head of the department." *Perry v. State Civil Serv. Comm'n (Dep't of Labor & Indus.)*, 38 A.3d 942, 951 (Pa. Cmwlth.

13

2011). "Even a single instance of misconduct or an error of judgment can constitute just cause for dismissal if it adversely reflects on the fitness of a person for his duties." *Davis v. Civil Serv. Comm'n of Phila.*, 820 A.2d 874, 878 (Pa. Cmwlth. 2003). Further, "[w]hether the actions of a civil service employee constitute just cause for removal is a question of law fully reviewable by this Court." *Perry*, 38 A.3d at 951.

Here, the Commission concluded that substantial evidence supported the Department's charges against Campbell for submitting or permitting the submission of reports containing omissions and/or misrepresentations, failing to cooperate truthfully and completely with a Department investigation, and failing to adequately supervise subordinates and inmates. Based thereon, the Commission declared that Campbell's conduct "reflect[s] negatively upon his competence and ability to perform his job duties." Commission Adjudication at 19.

This Court's consideration of this matter is informed by *Department of Corrections v. Roche,* 654 A.2d 64 (Pa. Cmwlth. 1995), wherein Corrections Officer Roche observed an inmate transfer during which numerous inmates were injured. Upon questioning, Roche denied that he had seen any staff assault the inmates. However, after the investigation revealed that Roche's representations were inconsistent with the Department's findings, Roche was directed to undergo counseling. Thereafter, Roche was ordered to testify about the incident before a grand jury, and Roche testified that he did not observe staff assault any inmates. The grand jury indicted him for making false declarations regarding the incident. Roche later admitted that he had observed staff assault inmates during the incident. The resulting grand jury indictments of prison guards led to negative publicity. Roche was ultimately discharged from his position for violating the Department's Code of Ethics (Ethics Code). On appeal, the Commission reviewed the Department's action and, although it concluded that the Department established Roche's ethics violations,

the Commission determined that his conduct did not warrant his removal, so Roche was reinstated. The Department appealed to this Court. This Court reversed the Commission's decision on the basis that the Commission abused its discretion. This Court explained:

> [T]here is no legal excuse for Roche's failure to report the assaults on prison inmates. As a Sergeant and Corrections Officer, he had a duty to prevent such injustice. At the very least, **he was required to report the abuses and to do so promptly and truthfully.** . . . **He did neither.** Further, he **participated in an attempt to cover-up** the criminal actions of fellow corrections officers **by lying about what he observed that evening**, not only to the officers who conducted the internal investigation, but to the United States District Court grand jury.
>
> Roche's actions constitute a dereliction of duty in a matter of critical public concern and reflect upon his ability to perform his duties as a Corrections Officer. 'The appearance of wrongdoing by an employee in a sensitive position **reflects unsatisfactorily on the employee's ability to perform his duties and** supports his *dismissal for just cause.*' *Stone v. State Corr*[.] *Inst*[.] *at Graterford*, . . . 422 A.2d 1227, 1228 ([Pa. Cmwlth.] 1980). Further, his actions contributed to the discredit brought upon the Department by the events of November 6, 1989. *See Ettinger v. State Civil Serv*[.] *Comm*[']*n*, . . . 539 A.2d 67 ([Pa. Cmwlth.] 1988) (prison officer is [a] highly sensitive position which requires those who hold it to avoid appearance of impropriety); *Dep*[*'t*] *of Justice, Bureau of Corr*[.] *v. Grant*, . . . 350 A.2d 878 ([Pa. Cmwlth.] 1976).

*Roche*, 654 A.2d at 69 (emphasis added).[7]

Here, the Department's witnesses credibly testified that Campbell directed them to alter their DC-121 reports relative to the Incident to intentionally omit and/or misrepresent information pertaining thereto. The record evidence further

___

[7] The Court opined that to permit the Commission's decision to stand "would emasculate the ability of the Department to rid itself of employees unable to perform their duties within the ethical standards set forth in the [Ethics Code] handbook." *Roche,* 654 A.2d at 69.

15

demonstrated that Campbell failed to properly supervise inmates and his subordinates and adhere to the Ethics Code and the Department's policies and procedures. Notably, the Department presented testimony describing the importance of the relevant Ethics Code sections and Department policies and procedures, and the potential impact of Campbell's failure to adhere to them.

Baird explained the importance of employees submitting truthful complete reports, as follows:

> We trust our lieutenants - - - all of our staff members actually to be truthful and forthright when it comes to report writing. It's imperative that everybody inside the institution knows exactly what happens during an incident. And when it's misrepresented, there's a lot of security concerns that may be overlooked.

N.T. at 187-88. Baird further expounded:

> I believe we found that [] Campbell failed in all regards of his essential job functions. When he entered the institution that day as the . . . SRTU [L]ieutenant, it was his responsibility to ensure that staff were following the rules and regulations and ensuring the care, custody, and control [of] inmates. He failed to do those. He did not - - - there were inmates out in the dayroom without an officer present. There was an inmate in the law library. The secure feeding aperture, the tray slot, pie slot - - - it's been referred to as several different things - - - it was not secured. Obviously, we had an inmate - - - there was an assault. There was an inmate that came out of that secure aperture. Like [] Hoover testified, we're not 100 percent sure, but he came out. And it should have never happened. The reports submitted were less than truthful. They weren't accurate. They weren't complete. He failed to look further into the situation. And we just felt that he had failed [i]n several - - - several ways.
>
> . . . .
>
> When the commissioned officer fails to perform his duties, we have an incident like happened on this day. If he would have went in there and done that, this [I]ncident would have

16

never occurred.  I'm 100 percent certain that this [I]ncident would have never occurred.  And obviously, we had inmates get injured.  When the staff responded, they did use force.  They could have been injured.  And obviously, that's safety and security.

N.T. at 190-192; *see also* N.T. at 198.  Baird also testified that he could no longer trust Campbell to write reports, since he had exhibited a willingness to submit misleading information.  *See* N.T at 202.  Clearly, the Department's evidence demonstrated that Campbell's failures to properly execute his duties during and after the Incident, "touch[ed] upon [his] competency and ability" in a "rational and logical way[.]"  *Webb,* 934 A.2d at 188.  Accordingly, we conclude that the Commission properly declared that there was just cause to terminate Campbell's employment.

Campbell next asserts that the Commission erred by refusing to compel the appearance and testimony of various witnesses.  We disagree.

Section 105.14a(a) of the Commission's Regulations provides the procedure for requesting subpoenas:

(1) Subpoenas for the attendance of witnesses or for the production of documents will be issued only upon written application to the Chairperson of the Commission or the Commissioner presiding at hearing, with a copy to the opposing party.

(2) Written application shall specify as clearly as possible the relevance of the testimony or documentary evidence sought. As to documentary evidence, the request must specify to the extent possible the documents desired and the facts to be proved thereby.

(3) Failure to adhere to the requirements of this subsection may result in the refusal by the Commission to issue the requested subpoenas.

(4) Subpoenas for new or additional witnesses will not be issued after a hearing has been commenced and continued unless orally requested on the record at the hearing and approved by the Commission, except that subpoenas issued

prior to the commencement and continuance of the hearing may be reissued upon written request.

4 Pa. Code § 105.14a(a).

By April 20, 2016 letter (April 20th Letter), Campbell requested the Commission to issue subpoenas for eight witnesses, including Heverly, McFee, Rutherford, Corrections Officers Steven Conklin (Conklin) and T. Van Orden (Van Orden), Garman, Tice and Captain Scott Dale (Dale). In accordance with Section 105.14a(a)(2) of the Commission's Regulations, the April 20th Letter named the witnesses and described the reasons for their testimony as follows:

**2. [] Conklin - CO1**

. . . .

[] Conklin was also an eyewitness to the inmate altercation that resulted in [Campbell's] termination.

. . . .

**4. [] Van Orden - CO1**

. . . .

[] Van Orde[n] was an eyewitness to the inmate altercation that resulted in [Campbell's] termination.

. . . .

**6. [] Tice - DOC Deputy for Facilities Management**

. . . .

[] Tice authored [ the Synopsis] and represented that '[a]s Facility Manager, it is my responsibility to indicate the action taken against an employee. My hand-written instructions and signature will serve as the approval for this action,' indicating that [] Tice did approve the disciplinary action against [Campbell], which approval was redacted from the Synopsis.

18

**7. [] Garman, Superintendent, Rockview []**

. . . .

Superintendent Garman would or should have been the ultimate authority for the imposition of the disciplinary action against [Campbell]; and would also have reviewed all documentary evidence used for that purpose.

**8. [] Dale, Rockview []**

. . . .

[] Dale observed a [Department] document from the highest authority at Rockview [], that recommended that [Campbell] be demoted, not suspended.

R.R. at 207a-208a (bold emphasis added).

The Commission refused to issue subpoenas for Conklin, Van Orden, Garman and Dale. At the hearing, Campbell's counsel did not raise the Commission's refusal to issue those subpoenas, and did not express his desire for their testimony. Only Tice's absence was discussed.[8] The law is well-established that issues not raised before a Commonwealth agency are waived and may not be raised on appeal. 2 Pa.C.S. § 703;[9] *see also* Pa.R.A.P. 302(a). Accordingly, we hold that, with the exception of Tice, Campbell waived his challenge to the Commission's refusal to issue subpoenas for the proposed witnesses.

---

[8]    The notes of testimony clearly reveal[] that only Tice's appearance was discussed:

Commissioner: . . . . You had one witness that you wished to call but was not available for today.

[Campbell's Counsel]: Yes. [] Tice, as a matter of fact, authored the PDC - - - or signed off on the PDC minutes.

N.T. at 281.

[9] Section 703(a) of the Administrative Agency Law states: "A party who proceeded before a Commonwealth agency . . . may not raise upon appeal any . . . question not raised before the agency . . . unless allowed by the court upon due cause shown." 2 Pa.C.S. § 703(a).

19

Campbell asked the Commission to hold the record open for Tice's testimony. The Commission explained in a June 6, 2016 letter to Campbell's counsel:

> [Y]ou requested the Commission to hold the record open so you could obtain the testimony of [] Tice. []Tice chaired the panel of three who conducted the [PDC] with your client prior to his removal. The other two members of the panel were [] Baird and . . . Confer, both of whom have already testified on the record and were cross-examined by you. Baird and Confer have both testified that it was the entire panel's conclusion that the charges were substantiated and warranted discipline, although the panel itself did not make a recommendation concerning the appropriate discipline. It is noted that none of the panel members, including [] Tice, have any direct personal knowledge of the [I]ncident upon which the final decision to remove your client was based.
>
> After careful review and consideration, the Commission has determined that i[t] has heard sufficient testimony concerning the events at the [PDC] from the two panel members who have already testified and that the testimony of a third member of the panel would only be cumulative and redundant. Therefore, the potential value of [] Tice's testimony, if any, is far outweighed by the additional time and expense that will be required to obtain it. Therefore, your request is denied. The record of evidence in this appeal is hereby closed.

R.R. at 209a.

> This Court has stated:
>
> The Commission's [R]egulations authorize the Commission to compel testimony or the production of documents by way of subpoena. 4 Pa.Code § 105.14a. In *Zukoski v. Unemployment Compensation Board of Review,* . . . 525 A.2d 1279 ([Pa. Cmwlth.] 1987), this [C]ourt held that an administrative agency empowered to subpoena witnesses or documents **has an absolute duty to subpoena witnesses necessary for a proper determination.** However, where the number and scope of the subpoenas requested suggest

that the subpoenas were sought to harass or conduct a 'fishing expedition', the agency does not commit an error of law or abuse its discretion in denying the subpoenas.

*Quinn v. Pa. State Civil Serv. Comm'n*, 703 A.2d 565, 570 (Pa. Cmwlth. 1997) (citations omitted; emphasis added). Notwithstanding, "[t]his Court will not reverse [a] decision to limit witness production except for an abuse of discretion."[10] *1st Steps Int'l Adoptions, Inc. v. Dep't of Pub. Welfare*, 880 A.2d 24, 34 (Pa. Cmwlth. 2005). Thus, we consider whether the Commission abused its discretion by denying Campbell's request because Tice's testimony was not "necessary for a proper determination." *Quinn*, 703 A.2d at 570.

Although Tice might have been able to provide insight into the Synopsis, two members of the PDC panel testified and explained that no recommendation on discipline was made. Because the two other members of the PDC panel testified before the Commission, Tice's testimony would be cumulative and redundant. Further, since the issue before the Commission was whether the **Department** had just cause to terminate Campbell's employment, the propriety of the PDC panel's recommendation was not at issue before the Commission. Under the circumstances, the Commission did not err by refusing to compel Tice's appearance and testimony.

Finally, Campbell contends that the Commission should have mitigated the Department's discipline. We disagree. Section 952(c) of the Act [11] provides:

> In the case of any employe removed, . . . the [C]ommission **may** modify or set aside the action of the appointing authority. **Where appropriate**, the [C]ommission may order reinstatement, with the payment of so much of the

---

[10] "An abuse of discretion is not merely an error of judgment, but occurs only where the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will, as shown by the evidence or the record." *Zappala v. Brandolini Prop. Mgmt., Inc.*, 909 A.2d 1272, 1284 (Pa. 2006).

[11] Added by Section 21 of the Act of June 26, 1989, P.L. 47, 71 P.S. § 741.952(c).

salary or wages lost, including employe benefits, as the [C]ommission may in its discretion award.

71 P.S. § 741.952(c) (emphasis added).

"Under Section 952(c) [of the Act], therefore, the Commission **may** modify the appointing authority's disciplinary action **in an appropriate case**, even where the underlying charges against the civil service employee are proven." *Dep't of Corr., State Corr. Inst. at Chester v. State Civil Serv. Comm'n (Mason)*, 837 A.2d 1273, 1277 (Pa. Cmwlth. 2003) (emphasis added). Although Section 952(c) of the Act authorizes the Commission to modify disciplinary action in appropriate instances, **it does not mandate it**, and we may not impose such a duty where the General Assembly has not seen fit to do so. Thus, the Commission is under no duty to modify Campbell's discipline.[12]

Further, the Commission's decision to modify a penalty is reviewed under an abuse of discretion standard. *See Roche*. The Pennsylvania Supreme Court has explained:

> While [we] ha[ve] indicated that the [Commission] may modify the action of an appointing agency 'even where the charges brought against the employee are proven,' *Galant*[ *v. Dep't of Env'l Res.*]*,* 626 A.2d [496,] 498 [(Pa. 1993)], we hold that the [Commission's] ability to alter an agency's employment action is not without boundaries.

*Pa. Game Comm'n v. State Civil Serv. Comm'n (Toth)*, 747 A.2d 887, 893 (Pa. 2000).

In *Toth*, The Pennsylvania Game Commission's (Game Commission) Chief of Personnel Service (Toth) challenged his discharge for purposely modifying the payroll computer system to circumvent a recent change to eligibility for a systematic pay increase. Toth was later charged with unlawful use of a computer and

---

[12] Campbell relies on federal law to argue that this Court should impose a duty on the Commission to consider modifying disciplinary action. Federal law does not govern the Commission's actions in this matter, and we will not impose a duty under the Act that is not included therein.

22

was accepted into the Accelerated Rehabilitation Disposition program. Before the Commission, Toth contended that he acted at the direction of his superiors. The Commission concluded that because Toth's actions were at the direction of his supervisors, Toth did not act without justification and accordingly, he should be reinstated.

On review, this Court reversed the Commission's decision. The *Toth* Court affirmed, explaining:

> In light of the position held by Toth, the unjustified acts he committed, and just cause for his termination, the [Commission] was without a basis to modify the Game Commission's decision to terminate Toth. Simply stated, this is not an appropriate situation to modify the Game Commission's action. In this case, the proven and admitted misconduct constituted a serious dereliction of duty and directly impacted upon Toth's ability to perform in his position. By the [Commission's] own findings, just cause for dismissal was established and modification was not appropriate.

*Toth*, 747 A.2d at 893–94. Similarly, in *Roche*, this Court found the employee's conduct merited dismissal, and the Commission's modification was an abuse of discretion.

In stark contrast, here, the Commission did not modify the Department's penalty, but instead, upheld Campbell's dismissal. However, similar to *Roche*, the Commission, as fact finder, found that an individual in a highly-sensitive position directed subordinates to make misrepresentations in incident reports pertaining to an inmate assault that resulted in serious injuries. The Commission further determined that Campbell failed to adhere to Department's policies and procedures and violated the Department's Ethics Code. Thus, even if this Court were to conclude that the Commission had a duty to consider modifying the penalty, we hold that in light of the

Commission's findings, the Commission did not abuse its discretion by declining to modify Campbell's employment termination.

For all of the above reasons, the Commission's Adjudication is affirmed.


_____
ANNE E. COVEY, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Darrell J. Campbell,                          :
                          Petitioner          :
                                              :
                    v.                        :
                                              :
State Civil Service Commission                :
(Department of Corrections),                  :     No. 382 C.D. 2017
                          Respondent          :


# O R D E R

AND NOW, this 28th day of December, 2017, the State Civil Service Commission's March 3, 2017 adjudication is affirmed.


_____
ANNE E. COVEY, Judge